**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

LORELLE THOMPSON,

          Plaintiff,                        Case No. 1:22-cv-00541-MDB

v.

FORD MOTOR COMPANY,
a Delaware company,

          Defendant.

**<u>SECOND AMENDED COMPLAINT WITH JURY DEMAND</u>**

COMES NOW PLAINTIFF, LORELLE THOMPSON, complaining of FORD MOTOR

COMPANY, Defendant herein, and for cause of action states:

**I.**
**<u>NATURE OF THE ACTION</u>**

1.    This is a civil action arising out of serious, permanent, life-scarring personal

injuries sustained by Lorelle Thompson on or about December 27, 2016, arising from a defective

Ford Expedition (the "Vehicle").

2.    Plaintiff brings this automotive, products liability, personal injury action for her

damages sustained, including, but not limited to pain, suffering, permanent disfigurement and

scarring, physical impairment, loss of earning capacity, and loss of enjoyment of life.

3.    This products liability action includes claims for strict products liability, general

negligence, failure to warn, gross negligence, reckless conduct, and breach of warranty.

4.    The claims asserted herein arise from the design, selection, inspection, testing,

assembly, equipping, marketing, distribution, and sale of a defective and unreasonably dangerous

Vehicle. Defendant was aware, at all times, of its actions and acted with careless and flagrant

disregard for the safety and welfare of drivers who they knew would purchase

1

its vehicles. Defendant has willfully and wantonly gone to great length to hide the truth, knowing that its concealment of these defects would kill or injure thousands of Americans. Those Americans include the Plaintiff who has brought this action.

## II.
### PARTIES

5.     Plaintiff LORELLE THOMPSON is an individual and resident of El Paso County, Colorado.

6.     Defendant FORD MOTOR COMPANY (also referred to as "FORD") is a for-profit corporation which has become one of the largest automobile manufacturers in the world. FORD is a Delaware corporation and maintains its principal place of business in Dearborn, Michigan. FORD manufactures and sells automobiles, including the Subject Vehicle, through its related subsidiaries and/or operating units, including but not limited to dealers, independent retail dealers, outlets and authorized dealerships primarily in North America, Europe, Asia, and Japan. FORD has been directly involved in the safety investigation and determinations made as to the motor vehicle safety issues arising from the defective and unreasonably dangerous condition of certain FORD vehicles it designs, manufactures, markets, and distributes for sale to the consuming public, including the Subject Vehicle. FORD has been actively involved in developing knowledge of the motor vehicle safety issue at issue in this case over several decades. Defendant FORD has appeared and answered herein

## III.
### JURISDICTION AND VENUE

**A.     Subject matter jurisdiction**

7.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332(a) based on complete diversity of citizenship between Plaintiff and Defendant. Plaintiff is

a citizen of the State of Colorado. Defendant is a corporation and is incorporated under the laws of Delaware, and has its principal place of business in Dearborn, Michigan. The amount in controversy exceeds $75,000, exclusive of interest and costs.

**B.    Personal jurisdiction**

8.    This Court has personal jurisdiction over Defendant FORD pursuant to the Colorado Long-Arm Statute, § 13-1-124, C.R.S., in that FORD transacted business in the State of Colorado, made contacts within the State of Colorado, and/or committed a tortious act in this State.

9.    Further, this Court has personal jurisdiction over Defendant FORD because the exercise of jurisdiction comports with Colorado's long-arm statute and constitutional due process since Colorado's long-arm statute is coextensive with the constitutional limitations imposed by the Due Process Clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution. The exercise of jurisdiction over FORD in this case by the State of Colorado comports with due process because FORD has the requisite minimum contacts with Colorado such that having to defend a lawsuit in Colorado will not offend traditional notions of fair play and substantial justice. In all, FORD's contacts with the State of Colorado are such that it is foreseeable that FORD could reasonably anticipate being hailed into court here.

10.    Minimum contacts may be established in two ways. First, general jurisdiction exists where the defendant has "continuous and systematic" contacts with the forum state such that exercising personal jurisdiction is appropriate even if the cause of action does not arise out of those contacts. Second, specific jurisdiction exists where the cause of action is "related to" or "arises out of" the defendant's activities within the forum state. In such cases, jurisdiction is proper where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State.

### 1.   General jurisdiction

11.   This Court also has general jurisdiction over FORD because at all times material hereto, FORD conducted business in Colorado and maintained sufficient continuous and systematic contacts with Colorado such that the exercise of jurisdiction over FORD would not offend traditional notions of fair play and substantial justice.

### 2.   Specific jurisdiction.

12.   Colorado has specific jurisdiction over FORD because Plaintiff's claims are "related to" or "arise out of" FORD's activities within Colorado. In other words, jurisdiction is proper because FORD's contacts proximately result from actions by FORD itself that create a substantial connection with the State of Colorado. This substantial connection has been established by FORD in purposefully directing its actions at the State of Colorado and purposefully availing itself of the privilege of conducting activities or consummating transactions within Colorado.

13.   Even assuming that FORD's contacts with Colorado may not support general jurisdiction (which Plaintiff contests), its contacts may still meet the less stringent standard for specific jurisdiction if sufficiently related to the claims. Consequently, specific jurisdiction calls for a two-step inquiry: (a) whether the plaintiff has shown that the defendant has minimum contacts with the forum state; and, if so, (b) whether the defendant has presented a compelling case that the presence of some other considerations would render jurisdiction unreasonable.

### a.   Minimum contacts

14.   The minimum contacts test for specific jurisdiction encompasses two distinct requirements: (i) that the defendant must have purposefully directed its activities at residents of the forum state, and (ii) that the plaintiff's injuries must be related to or arise out of the defendant's forum-related activities.

4

### (i).     Purposeful direction requirement

15.     Where the defendant deliberately has engaged in significant activities within a State, it manifestly has availed itself of the privilege of conducting business there. In that case, it is presumptively not unreasonable to require the defendant to submit to the burdens of litigation in that forum.

16.     FORD has, at all material times relevant to this case, purposefully directed its conduct toward Colorado by, among other means:

    (1)     marketing vehicles through distributors and/or dealers who have agreed to serve as its sales agents in Colorado;

    (2)     advertising and promoting its vehicles through media that target Colorado consumers (among others) and/or through channels that would be expected to reach Colorado consumers;

    (3)     establishing channels for providing regular advice to customers in Colorado;

    (4)     designing, developing, manufacturing, testing, marketing, distributing, and/or selling vehicles for the market in Colorado;

    (5)     placing into the stream of commerce the Subject Vehicle with the knowledge that it could reach Colorado;

    (6)     placing into the stream of commerce the Subject Vehicle that was involved in an accident in Colorado in which Plaintiff, a Colorado resident, was injured;

    (7)     placing into the stream of commerce FORD vehicles with the clear understanding that its vehicles will find their way to Colorado;

(8)     marketing the Subject Vehicle model and other vehicles for sale via television and print advertising in Colorado;

(9)     creating and maintaining a website (https://www.ford.com/) to promote business goodwill with consumers in the United States, including consumers in Colorado;

(10)    creating and maintaining a "dealer locator" function on the https://www.ford.com/ website that directs Colorado consumers to FORD dealerships located in Colorado based on zip codes;

(11)    establishing and maintaining authorized dealers in Colorado for the sale of FORD automobiles;

(12)    establishing and maintaining business relationships with automotive dealers in the State of Colorado. A website maintained by Autotrader shows that there are seventeen dealers within 100 miles of Denver zip code 80201 that sell new Ford and Lincoln vehicles (FORD's brands).[1] On information and belief FORD makes millions of dollars in profits on an annual basis from its business relationships with Colorado dealers. In addition, on information and belief FORD offers Colorado dealers benefits, discounts, and/or incentives that the dealers would not otherwise have but for their relationships with FORD as dealers. Further, on information and belief FORD sells parts and accessories in Colorado primarily to its dealerships

---

[1] See https://www.autotrader.com/car-dealers/New/Ford/Denver+CO-80201?zip=80201&searchRadius=100&state=CO&city=Denver&makeCodeList=FORD&listingTypes=NEW&sortBy=distanceASC&numRecords=25&firstRecord=0

(which in turn sell these products to retail consumers) and to authorized parts distributors (which in turn primarily sell these products to retailers). (See FORD's Form 10-K filing for the fiscal year ending December 31, 2017). Thus, even if the Colorado dealers are "independent" dealers, their business relationships with FORD demonstrate an intentional and concerted effort by FORD to target the State of Colorado;

(13)   on information and belief, offering extended service contracts for vehicles purchased by Colorado consumers;

(14)   licensing or otherwise authorizing Colorado dealers to use the FORD name to market its vehicles. An exemplar, the Freeway Ford dealer located in Denver, Colorado, is shown below:



The use of the FORD name on the dealer's storefront also suggests that the dealer has a special relationship with FORD or that the dealer is company owned;

(15)   operating Ford Motor Credit Company, LLC ("Ford Credit'), FORD's financial services arm, in the State of Colorado in order to finance the purchase of vehicles by Colorado consumers. According to FORD's Form 10-K for 2017, FORD's "wholly-owned subsidiary Ford Credit offers a wide variety of automotive financing products to and through automotive dealers throughout the world. The predominant share of Ford Credit's business consists of financing our vehicles and supporting our dealers." As described in Ford Credit's Facebook Page, Ford Credit maintains business operations and employs personnel in Colorado Springs, CO. In addition, the Better Business Bureau website shows that Ford Credit maintains an address in Colorado Springs, CO;

(16)   on information and belief, making and/or purchasing retail installment sales contracts and other financing products through Ford Credit for new and used vehicles purchased by Colorado consumers;

(17)   on information and belief, making wholesale loans to dealerships in Colorado through Ford Credit to finance the purchase of vehicle inventory, otherwise known as floorplan financing;

(18)   obtaining authorization through the Colorado Secretary of State to conduct business in the State of Colorado and designating an agent in Colorado for receipt of summonses and other forms of civil process.

17.    At all times relevant herein, FORD expected or should have expected that its acts would have consequences within the United States, and in the State of Colorado in particular. At all relevant times, FORD had knowledge that a Colorado resident could be injured by its defective vehicles.

18.    Because FORD's vehicles come into Colorado as a result of a deliberate, even if indirect, effort of the Defendant to serve Colorado's market, FORD may be said to have purposefully availed itself of the protections of this Sate and is subject to jurisdiction here.

19.    Thus, jurisdiction over FORD is reasonable when considering the following factors:

(1)    the burden on the defendant;

(2)    Colorado's interest in resolving the dispute;

(3)    the Plaintiff's interest in receiving convenient and effective relief;

(4)    the interstate judicial system's interest in obtaining the most efficient resolution of the controversies;

(5)    the shared interest of the several states in furthering fundamental social policies.

20.    In the instant case, the burden on FORD is minimal given the relatively convenient nature of modern air travel between Michigan and Denver. Litigating in Colorado is minimally more burdensome, if at all, than litigating in Michigan. Moreover, it is likely that FORD will be represented by Denver-based counsel. Regarding the second factor, Colorado has an interest in seeing that its citizens, such as Lorelle Thompson, are compensated for injuries caused by defective products in this State. Regarding the third factor, Ms. Thompson, who became physically incapacitated as a result of the incident in question and who has been treated by

9

doctors located in Colorado, would find more convenient and effective relief in Denver. Regarding the fourth factor, the interstate judicial system's interest in efficient resolution of controversies supports an exercise of jurisdiction in Colorado because the case was first filed in Colorado. Regarding the fifth factor--the shared interest of the several states in furthering fundamental social policies—does not appear to favor or disfavor an exercise of jurisdiction here. *See C5 Medical Werks, LLC v. CeramTEc GmbH*, No. 14-cv-00643 (D. Co. Sept. 8, 2014) (providing similar analysis of the five factors).

### (ii). Plaintiff's injuries are related to FORD's forum-related activities.

21.     If the sale of vehicles by FORD is not simply an isolated occurrence, but arises from the efforts of the manufacturer to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective product has been the source of injury to its owner. Colorado does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in this State.

22.     At all times relevant herein, FORD conducted substantial business in Colorado, regularly caused its products to be sold in Colorado, and Thompson's claims arise out of a tort Ford committed in Colorado. Therefore, personal jurisdiction is proper under the Colorado Rules of Civil Procedure and the Due Process Clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution. Consequently, the exercise of personal jurisdiction over FORD is consistent with traditional notions of fair play and substantial justice.

## C.   Venue

23.     Venue is proper as all or a substantial part of the events or omissions giving rise to

the claim occurred in the District of Colorado. Specifically, the incident made the basis of Plaintiff's claims occurred in El Paso County, Colorado, which is in the District of Colorado.

## IV.
### STATEMENT OF FACTS

24.     This case arises as a result of catastrophic injuries suffered by Lorelle Thompson when her left leg was crushed by a defective and unreasonably dangerous 1998 Ford Expedition (VIN # 1FMRU1764WLB23489) (hereinafter referred to as the "Vehicle").

25.     On December 27, 2016, Lorelle Thompson drove the Vehicle to her community mailboxes to get her mail when she was returning to her home after an errand. The community mailboxes were located on Ramblewood Drive three houses from her house. The street in the area of her mailbox was flat. Thompson put the Vehicle into what she believed to be "Park," opened the door, and stepped out of the Subject Vehicle onto the road. When she started to walking toward the mailbox, she slipped and fell on her back, with her left leg behind the driver's side front wheel. The Vehicle then unexpectedly went into powered reverse and began to roll backwards. The Vehicle rolled over Thompson, crushing her left lower leg (the "Crush Incident"). Thompson had her skin and muscle torn from her lower leg and suffered fractures to her tibia (the "shinbone") and her fibula (the smaller bone in the calf).

26.     Thompson's neighbors called for an ambulance, and Thompson was transported to Penrose-St. Francis Medical Center in Colorado Springs, Colorado for treatment. Her diagnosis was "Grade 3 open left tibia fracture" and "Left distal fibula fracture." Thompson's condition was stabilized, and she remained in the hospital until December 30 when a metal pin was placed in her tibia and locked into place using interlocking screws. As a result of the surgery, Thompson has a scar that runs from the top of her left foot to her knee. The healed scar looks like plastic skin.

27.     After she was released from the hospital, Thompson began a program of physical therapy at Centura Orthopedics under the care of Dr. Gary Simpson. Thompson used a wheelchair for months after her hospital stay and couldn't put pressure on her toes. When she was able to discontinue using the wheelchair, she used a walker for approximately one year until around April 2018. Thompson has had to frequently use a cane since she discontinued using the walker. Thompson will never be able to walk normally again and faces the very real possibility of an amputation of this leg due to a nerve condition that has developed because of the Crush Injury.

28.     After her treatment at Centura Othopedics, Thompson was treated by pain management physicians and other health care providers for intractable pain. When pain management failed to obtain long-term relief of pain, Thompson was referred to a physician who performed a nerve decompression surgery in January 2022 to treat the severe pain in her left leg. Despite the surgery, Thompson continues to have intractable pain in her lower left leg. Further, when the weather turns cold, her pain becomes worse. Her left leg from the knee down feels numb, like it is plastic, and she has severe scarring from multiple surgeries.

29.     Since her injury, Thompson has not had full use or range of motion of her left foot and ankle. For example, when walking up a flight of stairs, she has to lead with her right foot and then bring her left foot up, and then repeat the process. She cannot lead with her left foot. Also, she cannot climb ladders to do household chores such as dusting high places and changing light bulbs. She cannot walk long distances or stand for long periods of time. She does not have good balance and cannot stand on her left foot. She also has a permanent limp. Her leg injury affects many aspects of her life on a daily basis and makes it difficult to perform household chores and to have a social life. Some of the activities she did before the Crush Incident that she cannot do now are running, dancing, playing with her grandchildren, and most types of outdoor activities. In

addition, Thompson's pain and mobility have worsened over the last year to the point that she must now regularly use a cane to walk.

30.     Ms. Thompson suffers debilitating and intractable pain in her left leg after several surgeries, so much so that her physicians have told her that amputation of her leg may ultimately be the only way to reduce and control the severity of her chronic pain. This procedure would of course require another surgery, a prosthetic device, and physical therapy.

31.     Because of her injuries, Ms. Thompson missed time from work and cannot perform the duties required by her previous place of employment and the other types of employment that she had prior to the Crush Incident. Ms. Thompson is experiencing constant and severe left lower leg pain which is exacerbated by most daily and work activities. As a result, she will more likely than not remain unemployed for the balance of her work life.

32.     The condition of Ms. Thompson's left leg is, more likely than not, permanent. She will continue to suffer from pain, physical impairment, disfigurement, loss of enjoyment of life, and continue to incur medical and health care expenses and loss of earnings for the rest of her life. Ms. Thompson's life expectancy is approximately 24 years.

## V.
### ALLEGATIONS REGARDING THE PARK-TO-REVERSE DEFECT AND FORD MOTOR COMPANY'S KNOWLEDGE AND CONDUCT

33.     A "park-to-reverse" defect can exist in a vehicle equipped with an automatic transmission when there is inadequate mechanical force to ensure that a vehicle always defaults into an intended gear position (such as park or reverse). In a vehicle with a park-to-reverse defect, an operator of the vehicle in normal use can inadvertently and unintentionally place the shift selector *between* the intended park and reverse gear positions. Rather than defaulting into the park or reverse gear position, as it would in a properly designed vehicle which meets industry standards

(and FORD's own standards), the shift selector can remain for a period of time (several seconds or longer) *between* the intended park and reverse gear positions and from this "false park" position the vehicle then may (or may not) have a delayed engagement of powered reverse.

34.     Because of the possible delay in the engagement of reverse gear when an operator places the vehicle into what the operator would reasonably believe to be "park" based on the vehicle's cues, the park-to-reverse defect is unreasonably dangerous since an operator may have exited the vehicle, or be exiting the vehicle, when the vehicle suddenly and unexpectedly moves backwards in powered reverse.

35.     The subject Ford Expedition was equipped with a steering column shift tube in the shift system that was used to move the automatic transmission's mechanical linkage when shifting at the steering column such as the one included in Patent Number 4,928,545 "Steering Column Mounted Transmission Gear Shift Mechanism," described as a tube surrounded by clamps which are fixed by bolts to the upper surface of the steering column assembly and which also utilized bushings under the clamps. FORD was aware in 1998 and even before 1998 that the plastic bushings would deteriorate over time and slide out from underneath the upper shift tube clamps. For example, FORD issued a Technical Service Bulletin (99-16-4) in 1999 due to a concern related to a "misaligned shift column bushing" and warned its dealers – but not consumers – that when a shift tube bushing slips out of place, it can make it hard for the user to turn or remove the ignition key and that the bushing should be replaced. Testimony from Ford's Corporate Representative elicited in other litigation a decade ago shows that FORD knew there was a problem in the component at issue before 1997 and even as early as 1992. That same FORD employee testified that he alone had investigated over 700 complaints of unintended vehicle movement by 2011, at least some of which would involve this defect. He admitted the defect complained of in *Beene*

which is the same as that alleged in this case, is hidden and dangerous condition and not one involving routine maintenance or which would be discovered when the vehicle is being serviced. There are thousands of other similar incidents ("OSI") for this same defect.

36. When a shift tube bushing moves out of place, slack is created in the shift tube that can make the steering column shifting mechanism unreliable. In Ms. Thompson's Vehicle, the upper bushing on the shift tube deteriorated and slid out from the upper clamp. *Figure 1* below shows that the upper bushing in the Subject Vehicle has slid out from underneath the upper clamp (shown in the bottom right corner of the photo) and down the shift tube. In other words, this was a "misaligned shift column bushing" like that in the Technical Service Bulletin from 1999 described above which can create a condition where Park cannot be reliably engaged. Thus, FORD was aware before the Subject Vehicle was first sold, that the bushing under the upper clamp on the shift tube could move out from underneath the upper clamp and slide down the tube. This condition created slack and increased the stress on the clamp and bushing located at the lower end of the shift tube, which FORD was aware of before the Subject Vehicle was first sold. This added stress caused the lower clamp to break, which resulted in additional slack in the shifting mechanism that could lead to a "false" Park condition, which FORD was aware of before the Subject Vehicle was first sold. Although a vehicle is not supposed to be able to go from Park to another gear without someone stepping on the brake first, this can happen in FORD vehicles with this defect which is a violation of the Federal Motor Vehicle Safety Standards (FMVSS).



*Figure 1*

37.     *Figure 2* shows the broken clamp at the lower end of the shift tube of the Steering Mounted Transmission Gear Shift Mechanism, Patent No. 9,428,545, in the Subject Vehicle, which can create a condition where Park cannot be reliably engaged.



*Figure 2*

16

38.     FORD's former employee, Hugh Mauldin, who designed steering columns and transmission controls for FORD vehicles, testified in 2011 as an expert witness for FORD in the case of *Timothy Beene v. Ford Motor Company*, filed in the District Court of Colorado, a case involving a plaintiff who was injured by the inadvertent movement of a 1997 Ford Expedition because of the same defect that existed in Ms. Thompson's vehicle. According to Mauldin, the shift tube bushings were not designed or intended by FORD to move out from underneath the clamps, and when the bushings do move out of place, they can cause looseness in the shift assembly. Mauldin also testified that the design intent for the shift assembly is that the shift assembly must not loosen with use. Mauldin confirmed that, according to FORD's design failure mode and effects analysis (DFMEA), if you have looseness in the shift system, a potential effect of that failure is unintended vehicle movement – just like what happened in this case.

39.     According to Frederick King, another former FORD employee who was responsible for designing steering columns in FORD vehicles during his career at FORD, if the upper shift tube bushing becomes worn and moves out of place, extra wear is created on the rest of the shift system, particularly in the area of the lower bushing. The additional stress put on the lower end of the shift tube in the Subject Vehicle, caused by the displacement of the upper bushing, resulted in the lower shift tube clamp breaking, which created additional looseness in the shift system. King, who testified in 2011 as FORD's corporate representative, stated that he was aware of the potential for unintended vehicle movement as a consequence of an upper bushing being out of wear along with a severely worn lower bushing – just like what happened in this case.

40.     At the time FORD designed the Subject Vehicle, it was aware that the shift tube clamps were subject to breaking from stress, and FORD could have easily used a stronger material

17

that was feasible to manufacture the clamps, but chose not to.

41.     The above-described defects related to the shift tube bushings and clamps can create a foreseeably dangerous condition. As Mauldin, FORD's expert witness and former employee, testified in the *Beene* trial:

> **Q. Okay. And just so the jury understands, unintended vehicle movement is a very dangerous condition on a vehicle, isn't it?**
>
> **A. It can be.**
>
> **Q. And if you have unintended vehicle movement, it's reasonably foreseeable that that vehicle may hit pedestrians, may run into something with passengers in it. Anyone in the vicinity of that vehicle, if there is unintended vehicle movement, might be injured by that movement; correct?**
>
> **A. That's what [the DFMEA is] talking about, yes.**

42.     As a result of injuries and deaths resulting from park-to-reverse accidents in vehicles equipped with an automatic transmission (also referred to as "inadvertent rearward movement") from at least the 1950's and 1960's, the automobile industry, and FORD in particular, has long been aware of the defect, and the need to design vehicles so as to prevent the vehicle's shift selector from being inadvertently placed in a position *between* the intended park and reverse gear positions from which the vehicle can then have a delayed engagement of reverse.

43.     Defendant FORD, specifically, was well aware of the need to design its automatic transmission system so that an operator could not leave the vehicle between park and reverse from which there could be a delayed engagement of reverse.  Notice to Defendant FORD, well prior to Ms. Thompson's injuries, of the need to design vehicles to avoid a park-to-reverse defect included:

> a.     numerous park-to-reverse accidents in various vehicles made by
>
> Defendant FORD in the 1970's, 1980's and 1990's about which

FORD received notice through customer complaints. These included hundreds of complaints on a wide range of models equipped with the same or substantially similar transmission as in the Vehicle;

b.   FORD investigated the park-to-reverse safety issue in the early 1970's. It was, at that time, the third highest volume safety complaint being logged in Customer Relations Potential problem reports;

c.   numerous reports of injuries and deaths and an investigation by the National Highway Traffic Safety Administration ("NHTSA") of Defendant FORD's vehicles equipped with C-3, C-4, C-6, FMX and JATCO Automatic Transmissions. In 1980, NHTSA received reports of over 23,000 problems of inadvertent vehicle movement on FORD built vehicles, resulting in 5,593 accidents, 1,720 injuries, and 97 deaths;

d.   in February 1980, FORD reported knowledge of 2,252 accidents, 1,818 property damage, 703 injuries and 42 fatalities involving vehicles where inadvertent rearward movement was involved. FORD also reported at least 361 lawsuits involving allegations of inadvertent rearward movement;

e.   in a political agreement signed with the Department of Transportation, over the objections of NHTSA, on December 30, 1980, FORD agreed to send warning labels to approximately 22

million owners rather than, as NHTSA believed necessary, recalling them for mechanical repair;

f.    a 1985 NHTSA study found that FORD park-to-reverse accidents had caused a total of at least 306 deaths;

g.    in October 1991, FORD instituted a recall of FORD Aerostars, Bronco II's, Explorers and Rangers built in 1989 – 1991 to remedy a park-to-reverse problem in these vehicles; and,

h.    well aware of the cause of the defect, and its danger, FORD designed the circuit boards in certain of its vehicles so FORD could easily install an out-of-park alarm to warn drivers when the vehicle was in false park.

44.    Prior to the incident that is the basis of this lawsuit, FORD was aware of park-to- reverse incidents in vehicles containing the Steering Column Mounted Transmission Gear Shift Mechanism, Patent No. 4,928,545.

45.    Prior to the incident that is the basis of this lawsuit, it was reasonably foreseeable to FORD that the Subject Vehicle may be subjected to circumstances that could lead to a park-to- reverse incident involving the Steering Column Mounted Transmission Gear Shift Mechanism, Patent No. 4,928,545.

46.    A park-to-reverse incident is a dangerous condition.

47.    There is no federal standard or Federal Motor Vehicle Safety Standard (FMVSS) that applies to the shift column shaft bushings on the Steering Column Mounted Transmission Gear Shift Mechanism, Patent No. 4,928,545. However, it is a violation of a FMVSS if the shift

mechanism on a vehicle can be moved from Park without stepping on the brake, as can occur with this defect.

48.     Despite numerous accidents, injuries, and deaths in park-to-reverse accidents, Defendant FORD elected not to take steps to prevent the shift tube bushings from moving out of position until the year 2000 when it re-designed the steering column shift tubes to include a metal "shoulder" to prevent the upper bushing from sliding out from underneath the shift tube clamp. FORD did not take steps to warn owners of Ford Expeditions sold prior to the 2000 design change that the failure of shift tube bushings could cause unreliable shifting of gears, even after an incident similar to Ms. Thompson's occurred in 2006 involving Beene's 1997 Ford Expedition. The *Beene* case went to trial in 2011, and the jury found that the shift control system in the 1997 Ford Expedition was defective and because of that defect was unreasonably dangerous. The *Beene* jury awarded millions of dollars to the victim in that case.

49.     Instead of taking steps to prevent park-to-reverse incidents from occurring, warning customers or recalling the defective vehicles for dangers related to a "misaligned shift column bushing," FORD adopted a consistent policy of refusing to admit the existence of the defect in the vehicles, and instead blaming any resulting accidents, injuries, or deaths on "operator error." True to form, FORD is likewise blaming the victim in this case.

50.     The standard of care in the automobile industry is to fully investigate complaints or reports received by an automobile manufacturer which appear to pose a potential or actual safety risk.

51.     The investigative process by which complaints or accident reports are investigated is a technique called "root cause analysis" in which the vehicle manufacturer's engineering staff or outside consultants will (a) determine if the issue is safety-related; (b) carefully analyze the

complaint to fully understand it; (c) attempt to reproduce the complaint on the Subject Vehicle or an exemplar; (d) determine if the problem is a manifestation of a unique vehicle feature (*e.g.,* a vehicle manufacturing defect); (e) if the problem is not so identified, identify the engineering feature of the product which allows for the mechanical system to perform in the manner complained of; and (f) determine if there is an engineering solution through redesigning the product which will prevent it as a mechanical system from manifesting the complaint in the system or if an adequate redress is not feasible, then warn adequately to prevent injury.

52.     Despite the engineering standard being to conduct all necessary root cause analysis upon receiving complaints, and the fact that FORD conducted numerous root cause analyses on other potential and actual defects, FORD intentionally and purposefully avoided conducting any adequate root cause analysis on the park-to-reverse defects on any of its vehicles so as to avoid identifying a defect which would require FORD to undertake expensive measures to fix defective and dangerous vehicles which had been, and were being, sold to its customers and the public.

53.     FORD's refusal over a period of over 20 years to conduct appropriate and necessary "root cause analysis" was purposeful and intentional and was done with the understanding that its failure to conduct root cause analysis and identify and fix the park-to-reverse defect on its vehicles would result in injuries and deaths, including the injuries to Plaintiff Lorelle Thompson.

54.     It is appropriate engineering practice in the automobile industry to conduct a Design Failure Mode and Effects Analysis (DFMEA) any time a manufacturer or a supplier of the product creates a new design, makes a design change to an existing design, or has a different application of an existing component or subsystem.

55.     In a DFMEA, engineers engage in a process by which they attempt to identify potential issues that may be presented by the design, redesign, or pairing of components.  In a

DFMEA, all prior complaints, campaigns, warranty data or other documentation available on a specific component or system company-wide is reviewed and analyzed to identify potential failure modes of a product, develop a test protocol to test for each of the potential failure modes, and through completing such tests to rule out (or identify) the ability of a design, redesign or pairing of components to fail as have earlier designs.

56.     Had an adequate DFMEA been conducted on the transmission systems on FORD's other vehicles, or the Vehicle, it would have easily identified the park-to-reverse defect in the Vehicle.

57.     Yet despite the fact that DFMEA is a standard procedure conducted by FORD, at no time did FORD conduct any adequate DFMEA on the transmission system of the Subject Vehicle, or other vehicles as it related to the well-known park-to-reverse problems.

58.     The decision not to conduct an adequate DFMEA on the shift control system of the Vehicle, or other FORD vehicles, was purposeful and intentional so as not to identify the park-to-reverse defect which would require its being remedied and expose FORD to having to fix at considerable expense.

59.     As discussed below FORD's acts in failing to design so as to prevent the park-to-reverse defect, test the vehicle to determine if the park-to-reverse defect existed, warn of the danger via an out-of-park alarm, or remedy the park-to-reverse defect in the Subject Vehicle once it was produced was intentional and purposeful and demonstrated a conscious disregard for public safety in that FORD knew that accidents, serious injuries, and even death, such as that suffered by Plaintiff Lorelle Thompson would result from FORD's actions and omissions.

60.     FORD's actions constitute malice and / or willful and wanton conduct and were undertaken with the approval of, and were ratified by officers, directors, and managing agents of

the company on behalf of FORD.

## VI.
### CLAIMS FOR RELIEF
### COUNT ONE – STRICT LIABILITY IN TORT

61.    Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

62.    At all times relevant herein, FORD was in the business of designing, manufacturing, marketing, and selling vehicles, including the Subject Vehicle and others like it, throughout the United States, including Colorado.

63.    FORD is strictly liable for designing, testing, manufacturing, marketing distributing, selling and/or placing a defective and unreasonably dangerous product into the stream of commerce.

64.    At all times relevant herein, the Subject Vehicle was defective and unreasonably dangerous as to its design,  and warnings, causing the Vehicle to be in a defective condition that made it unreasonably dangerous for its intended use. At all times relevant herein, FORD took part in the design, manufacture, marketing, and sale of the Subject Vehicle prior to the Crush Incident made the basis of this Complaint.

65.    At all times relevant herein, the Subject Vehicle was being used in an intended and/or foreseeable manner when the Crush Incident alleged herein occurred. Plaintiff neither misused nor materially altered the Subject Vehicle, and upon information and belief, the Subject Vehicle was in the same or substantially similar condition that it was in at the time of purchase from Defendant or at time it was placed on the market; that is, it contained a Steering Column Mounted Transmission Gear Shift Mechanism, Patent No. 4,928,545, when purchased by Plaintiff that was without substantial change affecting it.

66.     At all times relevant herein, the Subject Vehicle was unreasonably dangerous and defective because it was designed, manufactured and sold with a defective transmission and/or steering column, a Steering Column Mounted Transmission Gear Shift Mechanism, Patent No. 4,928,545, that caused the park-to-reverse Incident described herein.

67.     The defective design of the Steering Column Mounted Transmission Gear Shift Mechanism, Patent No. 4,928,545, caused Plaintiff's injuries.

68.     At all times relevant herein, FORD was aware of feasible alternative designs which would have minimized or eliminated altogether the risk of injury posed by the Vehicle.

69.     The risk of the danger of the defect in the Subject Vehicle outweighs the benefits of the design when the product's usefulness and desirability, its safety aspects, the availability of a safer product, FORD's duty to eliminate the unsafe characteristics, the user's ability to avoid any danger through the exercise of care, the user's anticipated awareness of the inherent danger, and the feasibility of the manufacturing spreading any loss among its customers, among other factors are considered.

70.     At all times relevant herein, FORD had a duty to warn users of the dangers associated with the Vehicle.

71.     All at times relevant herein, FORD failed to warn of the inherent and latent defects that made the Vehicle dangerous and unsafe for its intended use.

72.     At all times relevant herein, FORD failed to design, test, manufacture, market, inspect, and/or sell the Vehicle and like vehicles that were safe for their intended use.

73.     As a direct and proximate result of FORD's conduct complained of herein, Plaintiff has suffered serious and permanent injuries including broken bones, scarring, and excruciating pain and suffering, emotional distress, physical impairment, disfigurement, loss of enjoyment of life,

medical expenses, and loss of earning capacity from the Incident.

74.     WHEREFORE, Plaintiff demands judgment against Defendant for all actual and compensatory damages she has suffered, together with interest, if applicable, for all costs of this action, and for any other such further relief as this Honorable Court and/or jury may deem just and proper.

## VII.
### COUNT TWO – NEGLIGENCE, GROSS NEGLIGENCE, WILLFUL AND WANTON MISCONDUCT: DESIGN DEFECT

75.     Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if they are fully set forth herein.

76.     At all times relevant herein, FORD designed, manufactured, inspected, tested, assembled, equipped, marketed, distributed and sold for profit, the Vehicle.

77.     At all times relevant herein, FORD designed the Vehicle owed Plaintiff a duty of reasonable care to design, select, inspect, test, assemble, equip, market, distribute and sell the Vehicle and its components so that it would provide a reasonable degree of safety during foreseeable operation of the Vehicle in the real-world highway environment of its expected use.

78.     At all times relevant herein, as designed, manufactured, inspected, tested, assembled, equipped, marketed, distributed and sold by FORD, the Vehicle is and was defective, unreasonably dangerous and unsafe for foreseeable users and occupants because of its park-to-reverse defect.

79.     At all times relevant herein, FORD was negligent, grossly negligent, willful, wanton, reckless, and careless in the design of the Subject Vehicle and breached its duties of care owed to Plaintiff by:

a.      failing to adopt and implement adequate safety hierarchy procedures and policies;

b.      failing to design, manufacture, test, assemble and/or install the gear shifting mechanisms so that the vehicle would not unintentionally shift from "park" to "reverse";

c.      failing to exercise reasonable care in the design of the Subject Vehicle;

d.      failing to exercise reasonable care in the testing of the Subject Vehicle;

e.      failing to exercise reasonable care in the inspection of the Subject Vehicle;

f.      failing to adopt and implement adequate warnings regarding the Subject Vehicle;

g.      failing to incorporate appropriate quality assurance procedures in the design of the Subject Vehicle;

h.      and on such other and further particulars as the evidence may show.

80.      At all times relevant, as a direct and proximate results of Defendant's negligence and breaches complained of herein, Plaintiff has suffered serious and permanent injuries including broken bones, scarring, and excruciating pain and suffering, emotional distress, physical impairment, disfigurement, loss of enjoyment of life, medical expenses, and loss of earning capacity from the Incident.

81.      WHEREFORE, Plaintiff demands judgment against Defendant for all actual and compensatory damages she suffered, together with interest, if applicable, for all costs associated with having to bring this action, and for any other such further relief as she may show herself entitled to.

## VIII.
## COUNT THREE – FAILURE TO WARN

82.     Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

83.     At all times relevant herein, FORD, as manufacturer of the Subject Vehicle, owed duties to warn of foreseeable dangerous conditions of the Subject Vehicle.

84.     At all times relevant herein, FORD knew or should have known of the Subject Vehicle's park-to-reverse defect.

85.     At all times relevant herein, FORD would have had no reason to believe that users would realize this potential danger.

86.     FORD Corporate Representative Frederick King testified in the *Beene* case as to the hidden nature of this defect and the danger it posed. In that same trial, it was shown that FORD did not warn of this defect or condition.

87.     At all times relevant herein, FORD affirmatively failed to exercise reasonable care to inform users of the Vehicle's dangerous conditions created by the park-to-reverse defect.

88.     This failure to warn renders the Subject Vehicle unreasonably dangerous and defective for the purposes of strict liability even if it is found to be otherwise free of defect. FORD failed to adequately warn of the potentially dangerous propensities of the Subject Vehicle – and specifically, of the steering column shift tube such as the one included in the "Steering Mounted Transmission Gear Shift Mechanism," Patent No. 9,428,545 – which rendered the Subject Vehicle unreasonably dangerous.

89.     Further, even if FORD did not become aware of the defect until after the sale of the Subject Vehicle, Colorado law recognizes that a manufacturer has a duty to warn when the design defect makes a product dangerous and the manufacturer did not become aware of this until

after the sale.

90.     As a direct and proximate result of FORD's failures to warn of the dangers posed by the park-to-reverse defect in the Subject Vehicle and the breaches complained herein, Plaintiff suffered injuries including broken bones, scarring, and excruciating pain and suffering, emotional distress, physical impairment, disfigurement, loss of enjoyment of life, medical expenses, and loss of earning capacity from the Incident.

91.     By reason of the foregoing, Plaintiff is entitled to recover for all general and special damages she sustained as a direct and proximate result of FORD's negligent and grossly negligent acts or omissions.

92.     WHEREFORE, Plaintiff demands judgment against Defendant for all actual and compensatory damages she suffered, together with interest, if applicable, for all costs of this action, and for any other such relief as this Honorable Court and/or jury may deem just and proper.

## IX.
## COUNT FOUR – BREACH OF IMPLIED WARRANTY

93.     Plaintiff adopts and re-alleges each prior paragraph, where relevant, as if set forth fully herein.

94.     At all times relevant herein, FORD was a "merchant" as to the Subject Vehicle within the meaning of Colorado's Uniform Commercial Code.

95.     At all times relevant herein, FORD manufactured and sold the Subject Vehicle, which is a "good" within the meaning of Colorado's Uniform Commercial Code.  Consequently, at the time of its sale, FORD impliedly warranted that the Subject Vehicle, including its component parts, was merchantable, such that it was fit for its ordinary purpose as a safe passenger vehicle and that it could pass without objection in the trade, and that it was adequately contained, packaged

29

and labeled.

96.   At all times relevant herein, FORD breached the implied warranty of merchantability as it concerns Plaintiff because the Subject Vehicle was not fit for the ordinary purposes for which it was anticipated to be used – namely as a safe passenger motor vehicle.

97.   Specifically, the Subject Vehicle was unreasonably dangerous and defective because it was designed, manufactured and sold with a park-to-reverse defect, which made the Subject Vehicle unfit for its ordinary purpose of providing safe transportation.

98.   At all times relevant herein, FORD further breached the implied warranty of merchantability to Plaintiff as the Subject Vehicle it designed, manufactured and sold contained a park-to-reverse defect, and therefore, it would not pass without objection in the trade.

99.   At all times relevant herein, FORD further breached the implied warranty of merchantability to Plaintiff because the Subject Vehicle was not adequately contained, packaged and labeled in that the directions and warnings that accompanied the Subject Vehicle did not adequately instruct buyers on the proper use of the Vehicle in light of the park-to-reverse defect.

100.   As a proximate result of FORD's collective and respective breaches of the implied warranty of merchantability, Plaintiff has suffered serious and permanent injuries including broken bones, scarring, and excruciating pain and suffering, emotional distress, physical impairment, disfigurement, loss of enjoyment of life, medical expenses, and loss of earning capacity from the Incident.

101.   By reason of the foregoing, Plaintiff is entitled to recover for all general and special damages proximately caused by FORD's breaches of its implied warranty of merchantability relating to the Vehicle.

102.   WHEREFORE, Plaintiff demands judgment against Defendant for all actual and

compensatory damages she suffered, together with interest, if applicable, for all costs of this action, and for any other such further relief as this Honorable Court and/or jury may deem just and proper.

## X.
### COMPENSATORY DAMAGES

103.    Plaintiff hereby adopts, restates, and re-alleges each and every paragraph of this Complaint as if fully and completely set forth herein.

104.    As a direct and proximate result of FORD's conduct, more particularly described above, Plaintiff suffered, sustained, and incurred the following injuries and damages, among others:

a.    Medical and health care expenses in the past;

b.    Medical and health care expenses in the future;

c.    Pain and suffering in the past;

d.    Pain and suffering in the future;

e.    Physical impairment in the past;

f.    Physical impairment in the future;

g.    Disfigurement in the past;

h.    Disfigurement in the future;

i.    Lost wages/loss of earning capacity in the past;

j.    Loss of earning capacity in the future;

k.    Loss of enjoyment of life in the past;

l.    Loss of enjoyment of life in the future;

m.    Expenses for essential services;

n.    Attorney's Fees (where recoverable) and Costs; and

o.    Other damages.

105.    Plaintiff would show that her damages, injuries and/or losses are within the jurisdictional limits of this Court, and include the above damages, and any other consequential damages foreseeably arising from the incidents in question.

## XI.
### EXEMPLARY DAMAGES

106.    Plaintiff hereby adopts, restates, and re-alleges each and every paragraph of this Complaint as if fully and completely set forth herein.

107.    The evidence thus far establishes that FORD knew of the defect years before the Subject Vehicle was manufactured, knew of the dangerous condition this defect caused, knew that others had been injured by it and that it had manifested hundreds, if not thousands of times, yet has not even attempted to remedy the defect for vehicles manufactured prior to 2000, warned of it, recalled affected vehicles, or otherwise acted in any way to protect consumers from harm. Instead, at most, FORD sent a Technical Service bulletin to its dealers regarding this defect as early as 1999 as discussed above. But that would not make the knowledge public or help those who get their vehicles serviced at places other than a dealership. FORD continued using this same component in its vehicles long after knowing all of this.

108.    In the intervening years, more incidents have occurred, more people have been injured, and FORD has said nothing to consumers to warn them nor has it even attempted to remedy the defect in vehicles manufactured prior to 2000 even as complaints of unintended vehicle movement incidents have continued to roll in. One notable example is that of Timothy Beene who brought suit against FORD in 2008 alleging these same defects and a jury found in his favor in 2011. FORD's Corporate Representative in that case testified about what FORD knew and when as set out above. FORD began receiving complaints before 1997, that is, before the Subject Vehicle

was manufactured. By the time that the *Beene* case went to trial, Mr. King alone had conducted over 700 inspections of vehicles that manifested the result of unintended vehicle movement, at least some of were the result of this defect. FORD has never issued a recall of these vehicles, so the problem has not been remedied or warned in these vehicles about despite FORD's admission that this creates a dangerous condition.

109.    At a minimum, the *Beene* lawsuit would have put FORD on notice of the defect and dangerous inherent to it. Yet, nothing was done and Ms. Thompson was catastrophically injured in an incident that could have been prevented, was known to FORD, and which FORD has known how to remedy since the early 1990s. Ms. Thompson's injury was entirely preventable, but only if FORD had done the right, moral, and legal thing. It did not. Indeed, it still denies that there is a problem despite hundreds, if not thousands, of other similar incidents.

110.    Under Colo. Rev. Stat. §13–21–102(1)(a), a claim for exemplary damages is appropriate where the events resulting in a personal injury are "attended by circumstances of fraud, malice, or willful and wanton conduct."

111.    Willful and wanton conduct is defined as "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences of the rights and safety of others, particularly the plaintiff." *Id.* §13–21–102(1)(b). The Colorado Supreme Court has held that "[w]here the defendant is conscious of his conduct and the existing conditions and knew or should have known that injury would result, the statutory requirements" are met. *Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 66 (Colo. 2005).

112.    Plaintiff submits that under even the facts and evidence adduced this far the issue of exemplary damages is supported and should be submitted to the jury in this case for determination in an amount equal to the amount of actual damages awarded under C.R.S. §13-21-

102. Plaintiff expects that additional evidence will be uncovered as discovery unfolds will add even greater support.

113.    Plaintiff further reserves the right to submit a request for exemplary damages in an amount allowed under C.R.S. §13-21-102(3).

## XII.
## CONDITIONS PRECEDENT

114.    All conditions precedent to the bringing of this action and Plaintiff's right to the relief sought herein have occurred, have been performed, or have been excused.

## XIII.
## TOLLING OF THE STATUTE OF LIMITATIONS

115.    FORD has known of the park-to-reverse defects in its vehicles well before the Plaintiff purchased the Vehicle, yet concealed from and failed to notify the Plaintiff and/or the public about the full and complete nature of the defects in the Vehicle or other vehicles of its kind prior to the Incident.

116.    Any applicable statute of limitations has therefore been tolled by Defendant's knowledge, active concealment, and denial of the facts alleged herein, behavior which is ongoing to the present day.

117.    Accordingly, this action has been timely commenced within the applicable period of limitation.

## XIV.
## DEMAND FOR JURY TRIAL

118.    Plaintiff hereby requests a trial by jury on all issues of fact and has tendered the requisite fee.

## XV.
### PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff LORELLE THOMPSON respectfully prays that upon trial, Plaintiff have and recover the following:

1.  judgment against Defendant for compensatory damages in excess of the minimum jurisdictional limits of the Court;

2.  exemplary damages;

3.  costs of this suit, including attorneys' fees;

4.  pre-judgment interest in accordance with Colorado law;

5.  post-judgment interest in accordance with Colorado law; and

6.  such other and further relief as this Court may deem proper and just.

Respectfully submitted,

**LEGER KETCHUM & COHOON, PLLC**

*/s/ Bradley L. Leger*
Bradley L. Leger
bleger@lkclawfirm.com
Rodney K. Castille
rcastille@lkclawfirm.com
10077 Grogan's Mill Road, Suite 325
The Woodlands, Texas 77380
Tel: (832) 764-7200
Fax: (832) 764-7211

Bradly J. Holmes
Bradly J. Holmes, PC
9800 Mr. Pyramid Court, Suite 400
Englewood, CO 80112
Tel: (303) 594-7600
holmeslaw@comcast.net

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of July 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

| | |
|---|---|
| J. Randolph Bibb, Jr. | rbibb@lewisthomason.com |
| Ryan Nelson Clark | rclark@lewisthomason.com |
| Theresa Warden Benz | theresa.benz@dgslaw.com |
| Gabrielle L. Schneiderman | schneiderman@wtotrial.com |
| Sherry A. Rozell | sherry.rozell@mcafeetaft.com |

*s/ Bradley L. Leger*
Bradley L. Leger
