IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Maritza Dominguez Braswell**

Civil Action No. 22–cv–00541–MDB

LORELLE THOMPSON,

      Plaintiff,

v.

FORD MOTOR COMPANY, a Delaware company,

      Defendant.

---

## ORDER

      This matter is before the Court on four motions. First, Defendant Ford's Renewed Motion for Judgment as a Matter of Law Pursuant to F.R.C.P. 50(b). (["Renewed Motion for Judgment"], Doc. No. 313.) Plaintiff has filed a response (Doc. No. 325), to which Defendant has replied (Doc. No. 341). Second, Defendant Ford's Motion for a New Trial Pursuant to F.R.C.P. 59 (["Motion for a New Trial"], Doc. No. 314.) Plaintiff has filed a response (Doc. No. 326), to which Defendant has replied (Doc. No. 340.) Third, Defendant Ford's Motion to Alter or Amend the Judgment Under F.R.C.P. 59(e). (["Defendant's Motion to Alter the Judgment"], Doc. No. 315.) Plaintiff has filed a response (Doc. No. 327), to which Defendant has replied (Doc. No. 339). Fourth, Plaintiff's Motion to Amend Judgment Pursuant to Fed.R.Civ.P. 59(e). (["Plaintiff's Motion to Alter the Judgment"], Doc. No. 316.) Defendant has filed a response (Doc. No. 324), to which Plaintiff has replied (Doc. No. 336).

The Court held oral argument on these motions on January 8, 2025. (Doc. No. 358.) After carefully reviewing each motion, the briefing, transcripts, arguments and relevant law, the Court **DENIES** the Renewed Motion for Judgment, **GRANTS** the Motion for a New Trial, and finds Plaintiff and Defendant's Motions to Alter the Judgment to be **MOOT**. The Court accordingly **ORDERS** a new trial in this case.

## BACKGROUND

This is a products liability action concerning a 1998 Ford Expedition owned by Plaintiff, Lorelle Thompson. On December 27, 2016, Plaintiff was driving the vehicle in her neighborhood and stopped near her mailbox to check her mail. Upon exiting the vehicle, Plaintiff fell to the ground. While Plaintiff was on the ground, the vehicle rolled backward over her left leg. At a high-level, it is Plaintiff's contention that when she exited the vehicle, she slipped on ice, fell to the ground and lay there for a few seconds before the vehicle began rolling rearward and over her leg. She attributes the rearward movement to worn bushings that became loose and eventually dislodged, allowing her to shift into "false park" when she believed the vehicle was in park. Then, and with the vibrations of the running engine, the vehicle self-shifted into reverse, at which point it rolled over her.

Defendant on the other hand, contends Plaintiff did not slip on ice before the vehicle rolled. Instead, Plaintiff must have attempted to shift into park but mistakenly shifted into reverse instead, and as she was existing the vehicle to grab her mail quickly, she took her foot off the brake and the vehicle immediately began to roll back, knocking her down and eventually running her over.

2

The Court held an eight-day jury trial from April 8 to April 17, 2024. (*See* Doc. Nos. 302–09.) At the end of trial, the jury returned a unanimous verdict in favor of Plaintiff and against Defendant, awarding Plaintiff $11,575,000 in compensatory damages and $45,000,000 in punitive damages.[1] (*See* Doc. No. 298.)

Defendant now moves for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), or alternatively, for a new trial pursuant to Fed. R. Civ. P. 59(a)(1)(A).[2] (Doc. No. 314.) Defendant asserts several grounds for these two motions, which will be discussed in depth, below.

## LEGAL STANDARD

### I.    Federal Rule of Civil Procedure 50(b)

Pursuant to Rule 50(b), a party may make a renewed motion for judgment as a matter of law within 28 days of the entry of judgment. *See* Fed. R. Civ. Proc. 50(b). To preserve issues under Rule 50(b), a party must have moved for judgment as a matter of law under Rule 50(a) at trial. *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1228 (10th Cir. 2000). A party may not raise for the first time under Rule 50(b), issues not raised in an earlier Rule 50(a) motion for directed verdict. *United Int'l Holdings*, 210 F.3d at 1228.

---

[1] The award was for Plaintiff's Strict Liability and Negligence claims. The Court dismissed all other claims asserted by Plaintiff during the course of this action. (*See* Doc. No. 228 at 28–35; Doc. No. 282; Doc. No. 306 at 1060:20–1069:23.)

[2] Both parties also move to alter the judgment pursuant to Federal Rule of Civil Procedure 59(e). (Doc. Nos. 315; 316.) However, because the Court grants Defendant's request for a new trial, it need not reach those motions.

Under Rule 50(b), the Court examines all evidence admitted at trial, construes it in the light most favorable to the non-moving party, draws inferences in the non-moving party's favor, but refrains from making credibility determinations, re-weighing the evidence, or substituting its conclusions for those of the jury. *See Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 812 (10th Cir. 2000); *see also Thunder Basin Coal Co. v. Sw. Pub. Serv. Co.*, 104 F.3d 1205, 1212 (10th Cir. 1997) ("The jury...has the exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact.").

Said another way, on a Rule 50(b) motion, "the Court has the narrow task of determining only whether the jury verdict is supported by substantial evidence when the record is viewed most favorably to the prevailing party." *Live Face On Web, LLC v. Integrity Sols. Grp., Inc.*, 421 F. Supp. 3d 1051, 1060 (D. Colo. 2019) (citing *Webco Indus., Inc. v. Thermatool Corp.*, 278 F.3d 1120, 1128 (10th Cir. 2002)). The Tenth Circuit has described substantial evidence as "something less than the weight of the evidence and is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, even if different conclusions also might be supported by the evidence." *Webco*, 278 F.3d at 1128.

It is well settled that judgment as a matter of law is only appropriate only when the evidence "points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position." *Mountain Dudes v. Split Rock Holdings, Inc.*, 946 F.3d 1122, 1129 (10th Cir. 2019); *see also Finley v. United States*, 82 F.3d 966, 968 (10th Cir. 1996); *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 766 (10th Cir. 2019) ("A party is entitled to [judgment as a matter of law] only if the court concludes that all of the evidence in the record

reveals no legally sufficient evidentiary basis for a claim under the controlling law." (citations omitted)).

Moreover, "[j]udgment as a matter of law under Rule 50 is 'cautiously and sparingly granted,'" and "only when courts are certain that the evidence 'conclusively favors one party such that reasonable [people] could not arrive at a contrary verdict.'" *Curtis Park Grp., LLC v. Allied World Specialty Ins. Co.*, 2023 WL 5625450, at *5 (D. Colo. Aug. 31, 2023) (quoting *Mountain Dudes*, 946 F.3d at 1130).

## II.      Federal Rule of Civil Procedure 59(a)(1)(A)

When a case has been tried to a jury, a new trial may be granted "for any of the reasons for which new trial have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. P. 59(a)(1)(A); *see Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1217 (10th Cir. 2008) (noting a motion for a new trial may be granted on any error, so long as "the district court concludes the claimed error substantially and adversely affected the party's rights" (internal quotation omitted)). Whether to grant a motion for a new trial is committed to the district court's discretion. *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 762 (10th Cir. 2009); *see Weese v. Schukman*, 98 F.3d 542, 549 (10th Cir. 1996) (noting the Court's decision will only be reversed where "the trial court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances"). "A motion for new trial 'is not regarded with favor and should only be granted with great caution.'" *Breen v. Pruter*, 679 F. App'x 713, 729 (10th Cir. 2017) (quoting *United States v. Kelley*, 929 F.2d 582, 586 (10th Cir. 1991)).

## ANALYSIS

## I.      Defendant's Motion for Judgment as a Matter of Law Pursuant to Rule 50(b)

In its Renewed Motion for Judgment, Defendant argues it is entitled to judgment as a matter of law because Plaintiff failed to present sufficient evidence: (1) of causation; and (2) entitling her to punitive damages. (*See generally* Doc. No. 313.) As a threshold matter, the Court finds Defendant sufficiently raised these issues in its prior Rule 50(a) motion. *Marshall v. Columbia Lea Reg'l Hosp.*, 474 F.3d 733, 738 (10th Cir. 2007) (holding that a "pre-verdict Rule 50(a) motion" is "a prerequisite to a post-verdict motion under Rule 50(b)"); (Doc. No. 306 at 995:11–996:2 (saying Ford's Rule 50(a) motion would address, among other things, "causation as to all claims" and "punitive damages").) Finding the issues are properly before it, the Court turns to the substance of Defendant's arguments.

### A. Causation Evidence

At a high-level, Defendant presents a two-part causation argument. *First*, because Plaintiff failed to call her expert, Richard Hille, and because there was no reliable documentation for Mr. Hille's testing, Plaintiff's other expert, Neil Hanneman, offered speculative opinions—not supported by competent evidence—that a displaced bushing resulted in Plaintiff placing the vehicle into "false park," and that the vehicle self-shifted into reverse due to engine vibrations. (Doc. No. 313 at 8–10.) *Second*, even if Mr. Hille's testing was accepted through Mr. Hanneman—and Mr. Hanneman's opinions are taken at face value—Plaintiff's proof would still fail because Plaintiff must show the false park and self-shifting were not just possible, but probable. (*Id.* at 11.) The Court will first consider the impact of Mr. Hille's absence, then it will turn to Defendant's sufficiency-of-the-evidence arguments.

### 1. Mr. Hille's Absence

Mr. Hanneman clearly relied on Mr. Hille's work.[3] (Doc. No. 303 at 235:12–23 (explaining the testing conducted by Mr. Hille and stating that "[b]ased on this testing" it was his opinion "that the engine vibration caused the gear selector to slip back into reverse after it was in the false-park position").) When Plaintiff eliminated Mr. Hille as a witness, she robbed Defendant of the opportunity to cross-examine him and probe his work. This was particularly problematic because there was no way to "see" Mr. Hille's work in the absence of video or other documentation of the testing. (*See* Doc. No. 154-7 at 56: (Mr. Hille stating during his deposition that "we weren't set up for videos and everything" during his work on the exemplar vehicle).) And while it appears there may have been some photographs related to the testing, Mr. Hanneman did not describe those, nor did Plaintiff offer those, during trial. (*See also* Doc. No. 359 (noting "Plaintiff has not found any trial testimony where Hannemann specifically mentioned the photographs taken of the exemplar Expedition testing").) Moreover, Mr. Hanneman did not conduct any testing himself, did not oversee the test, did not even observe the test. (*See* Doc. No. 303 at 257:3–258:12.) Instead, Mr. Hanneman simply regurgitated the information Mr. Hille provided.

The Court is troubled that Plaintiff pulled the rug out from under Defendant's and the Court's feet at the last minute. If the Court had known in advance that Mr. Hille would not appear at trial, it would have excluded at least some of Mr. Hanneman's testimony.[4] But the

---

[3] Plaintiff argues Defendant waived its objection on this issue. (Doc. No. 325 at 7–8.) The argument is not persuasive. *See infra* 18–19 (waiver section), n. 10.

[4] Even during trial and during Mr. Hanneman's testimony, the Court continued to believe Mr. Hille would eventually testify. Plaintiff did not give the Court any reason to believe otherwise. (*See, e.g.*, Doc. No. 303 at 218:23–219:1 (at a sidebar during Mr. Hannemann's testimony in

Court did not exclude Mr. Hanneman. He *was* allowed to testify at trial, and the jury *did* indeed hear about and consider Mr. Hille's work, through Mr. Hanneman. To the extent that was error, the Court can address it (and indeed it does address it) under Rule 59. But under Rule 50(b), the Court focuses on the sufficiency of the evidence, as admitted during trial.[5]

### 2. Sufficiency of the Evidence

Taking Mr. Hanneman's opinions at face value, the Court next considers whether the evidence *admitted at trial*—and viewed in the light most favorable to Plaintiff—supports the jury's verdict. *Live Face On Web, LLC*, 421 F. Supp. 3d at 1060 (citing *Webco*, 278 F.3d at 1128).

Plaintiff begins by highlighting the following testimony from her expert, Kevin Vosburgh:

---

which the Court stated, "Mr. Hille is going to testify" and "I don't want [Mr. Hannemann] to testify about Mr. Hille's testimony," to which Plaintiff's counsel responded "[y]eah, I'm not going to be duplicative").)

[5] During oral argument on the Rule 50(b) Renewed Motion for Judgment, Defendant argued the Court could find Mr. Hanneman's testimony unsupported and unreliable, and on that basis strike his testimony first, then determine that in the absence of his testimony the causation evidence is insufficient. That may be. *See Hoffman v. Ford Motor Co.*, 493 F. App'x 962, 980 (10th Cir. 2012) (unpublished) (awarding judgment for the defendant after expert causation "evidence [was] rendered insufficient by the removal of erroneously admitted testimony" (quoting *Weisgram v. Marley Co.*, 528 U.S. 440, 444 (2000))). But the Court declines to take this two-step approach for two reasons. First, it is in tension with the well-settled law that on a Rule 50(b) motion, the Court is limited to considering the evidence admitted at trial and must view it in the light most favorable to Plaintiff. *See Webco Indus., Inc.*, 278 F.3d at 1128. Second, unlike other cases where a court takes the two-step approach of striking an expert first, then finding the evidence insufficient as a matter of law, in this case, striking Mr. Hanneman's testimony does not leave Plaintiff without a causation expert. If the Court had stricken Mr. Hanneman's testimony at trial, Plaintiff may have pivoted and called Mr. Hille. Striking Mr. Hanneman's testimony now would deprive Plaintiff of that opportunity.

(1)    When the vehicle was in neutral at the location where Ms. Thompson had been injured, with the engine running, it did not move. (Doc. No. 325 at 2 (citing Doc No. 302 at 79:2–12).)

(2)    When the vehicle was placed in reverse and the brake pedal was released (to see how fast it moved rearward), it moved within a few tenths of a second. (*Id.* (citing Doc. No. 302 at 79:19–80:14).)

(3)    When the vehicle was deliberately placed in "false park," with the engine running, and then the shifter was deliberately moved into reverse (to see how quickly it moved), it moved in less than a second. (*Id.* (citing Doc. No. 302 at 80:16–82:10).)

According to Plaintiff, Mr. Vosburgh's reconstruction work allowed him to conclude that if the vehicle had indeed been in reverse when Ms. Thompson started to get out, the vehicle would have started moving rearward less than one second after she took her foot off the brake. (*Id.*) And while it is possible for someone to get out of a vehicle that is in reverse, Mr. Vosburgh eliminated that possibility here, because of the way Ms. Thompson fell and the position she was in after the incident. (*Id.* at 2–3.) Thus, based on Mr. Vosburgh's review of the evidence, Ms. Thompson got out of the vehicle while it was stationary, slipped on ice beside her vehicle, and then 5–6 seconds after she exited the vehicle, it rolled rearward and ran her over. (*Id.* at 3.)[6]

Next, Plaintiff sets forth key aspects of Mr. Hanneman's testimony to demonstrate the defect and its link to the false park and self-shift theory.

_____

[6] Defendant argues Mr. Vosburgh does not save Plaintiff's causation case because in each of his tests he manually shifted the Expedition. (Doc. No. 313 at 14.) But there is no dispute about that, and it is precisely that test that Mr. Vosburgh relies on to piece together his reconstruction. Defendant also contends that Mr. Vosburgh's testimony about the vehicle moving within a few tenths of a second after being placed in reverse, does not square with Plaintiff's testimony that the Expedition was in "false park" for 5 or 6 seconds before self-shifting to reverse. (*Id.*) But that is precisely Mr. Vosburgh's point—the fact that vehicle begins moving rearward so quickly after being placed into reversed, coupled with the way Plaintiff was lying on the ground, contradicts Defendant's theory of the incident and supports Plaintiff's version of the events, which is that it was in "false park" for 5 or 6 seconds, long enough for her to get out and fall, first.

(1)    Mr. Hannemann testified that based upon his investigation, the bushings used in the shift system of the subject vehicle can wear over time, allowing them to slide out of position. (*Id.* at 3 (citing Doc. No. 303 at 198:18–199:3).)

(2)    He testified that when the bushing slides out of position, that creates looseness in the system that allows the vehicle to be placed into false park, and can allow the vehicle to then slip into reverse and roll away. (*Id.* at 4 (citing Doc. No. 303 at 199:4–11).)

(3)    He testified the failure of the bushing could cause a driver to unintentionally place the vehicle into false park. (*Id.* (citing Doc. No. 303 at 222:5–15).)

(4)    And he testified that if a vehicle is placed in false park, it can lead to a park-to-reverse incident such as the one Ms. Thompson experienced. (*Id.* (citing Doc. No. 303 at 225:16–18).)

(5)    He brought an exemplar steering column into Court that had the same design as the subject vehicle. (*Id.* (citing Doc. No. 303 at 202:6–21).)

(6)    He identified the key components on the exemplar for the jury. (*Id.* (citing Doc. No. 303 at 205:23–206:18).)

(7)    Using the exemplar, he explained that when the bushing wears, it slides out from under the clamp, and that creates clearance between the clamp and the shift tube that allows the shift tube to "slide around," and causes the shift system to lose "all of its precision and consistency." (*Id.* (citing Doc. No. 303 at 206:19–22).)

(8)    He also testified that Ford's own documents indicate the bushing is not supposed to slide out from under the clamp. (*Id.* (citing Doc No. 303 at 208:11–20).)

(9)    Using the exemplar, Mr. Hannemann identified the insert plate, noting the detents on the insert plate which mark the locations where a vehicle is placed in different gears. (*Id.* (citing Doc. No. 303 at 221:6–19).)

(10)   He explained the detents for park and reverse are next to each other, and he explained the shift mechanism could sit between park and reverse, which was false park. (*Id.* (citing Doc. No. 303 at 222:1–13).)

(11)   He demonstrated on the exemplar that the shift system could be placed into false park. (*Id.* (citing Doc. No. 303 at 222:9–13).)

(12)   He identified photographs from the inspection of Ms. Thompson's vehicle which he used as a basis for his opinions. (*Id.* (citing Doc. No. 303 at 215:22–216:6).)

(13)   He testified the photos depicted a situation in which the bushing has slid out of place and is no longer beneath the clamp. (*Id.* (citing Doc. No. 303 at 216:20–217:12).)

(14)   He testified it was his opinion the bushing having slid out from under the clamp on Ms. Thompson's vehicle was a design defect. (*Id.* at 4–5 (citing Doc. No. 303 at 217:13–23).)

(15)    He testified that the bushing having slid out from beneath the clamp on Ms.
         Thompson's vehicle would have affected the shift system on her vehicle. (*Id.* at 5
         (citing Doc. No. 303 at 218:7– 11).)

(16)    He testified that the looseness in the shift system on Ms. Thompson's vehicle
         made it "prone to both false park and park-to-reverse." (*Id.* (citing Doc. No. 303
         at 219:4–7).)

(17)    He testified that during testing on the exemplar, Mr. Hille was able to put the
         vehicle into false park more than 50 times, and on one of those occasions the
         vehicle slipped into reverse from false park as a result of the engine running. (*Id.*
         (citing Doc. No. 303 at 235:12–17).)

(18)    He testified that based on this testing, it was his opinion that engine vibration
         caused the vehicle to slip into reverse from the false park position. (*Id.* (citing
         Doc. No. 303 at 235:18–24).)

(19)    He noted that a 1980 NHTSA report had also identified engine vibration as a
         mechanism that caused a vehicle to slip from false park into reverse. (*Id.* (citing
         Doc. No. 303 at 242:19–22).)

(20)    He testified it was his opinion this is what happened in Ms. Thompson's incident
         and that Ms. Thompson's incident would not have happened but for the design
         defect in the 1998 Expedition. (*Id.* at 4, 5 (citing Doc. No. 303 at 223:9–11,
         236:7–9).)

Plaintiff also points to the testimony of Matthew Fyie, Defendant's corporate

representative, who testified the bushing could slide out of position and that indeed it was out of

position in Plaintiff's vehicle. (*Id.* at 5–6.) Plaintiff also relies on the testimony of Frederick

King, a corporate representative who testified in a different case that with "the upper busing out

of position and the lower bushing worn, you could have a condition where when you shift the

vehicle just to park latch, the transmission may not engage in park." (*Id.* at 6 (quoting transcript

750:14-752:16).) Plaintiff also highlights that Defendant's expert, Hugh Mauldin, testified the

bushing is not supposed to dislodge, but sometimes it does and when it does, it can cause

looseness in the shift system. (*Id.* at 6–7.) And Plaintiff relies on her own testimony about the

events that day, complaints about false park incidents, and certain reports to support her theory

11

that the loose bushing defect allowed the vehicle to be placed into false park, and that within seconds of that, the vehicle self-shifted into reverse. (*Id.* at 14–15.)

Taken together, Plaintiff's evidence could lead reasonable minds to conclude: (1) the bushings wear over time and can become dislodged—Defendant's own expert admitted this much, (Doc. No. 306 at 1200:20–24 (Mr. Mauldin agreeing that the bushings can become dislodged from under the clamp)); (2) when bushings become worn and dislodged, they can cause the shifting mechanism to land on "false park"—again, Defendant's own expert admitted this, (*id.* at 1199:11–14, 1201:11–13 (Mr. Mauldin agreeing that "that when the bushing comes out from underneath the clamp [ ] it causes looseness" and that this looseness makes it more likely a vehicle could be placed in false park)); and (3) the engine's vibrations could cause the vehicle to self-shift from false park into reverse.[7] Moreover, a reasonable jury could consider the condition of Plaintiff's vehicle (*id.* at 1118:21–23 (Mr. Fyie acknowledging "we have seen that [the] upper bushing was moved out from underneath the clamp" in Plaintiff's vehicle)), the location of her injuries, and the position she was in when first responders arrived, to conclude this false-park-to-reverse scenario was, more likely than not, the cause of Plaintiff's injuries.

---

[7] Mr. Mauldin agreed that "one of the potential effects of looseness in the Ford shift system is unintended vehicle movement." (*Id.* at 1201:4–7.) But of course, the more direct support for this point comes from Mr. Hanneman's testimony, which relied in part on Mr. Hille's testing. (Doc. No. 303 at 235:12–17 ("And what Mr. Hille did is he took a running vehicle, an exemplar vehicle, and he was easily able to put it in the false-park condition. And he repeated this 50 times. And in one of those cases, he did have a situation where the vehicle did drop into reverse, just based on the vehicle running, sitting still.").) As noted above, the Court takes Mr. Hanneman's testimony at face value for purposes of the Rule 50(b) Renewed Motion for Judgment.

Defendant overstates the holding in *Roe v FCA US LLC*, 42 F4th 1175 (10th Cir. 2022).[8] In *Roe*, plaintiff raised similar "false park" claims, alleging that, due to a design defect, her Jeep could shift into "false park" *Id.* at 1177. Plaintiff offered two experts, one to testify he could easily manipulate the shift lever and a second that offered an exemplar to demonstrate how the Jeep could get from "false park" to reverse due to various forces, including vibrations. *Id.* at 1177–79. The district court excluded both experts as unreliable because of the analytical gap in their theory of causation, which failed to establish "a reasonable probability that there was sufficient time for Roe to get behind the vehicle after placing it into false park before it would slip into reverse." *Id.* at 1180. Moreover, the "experts did not address which, if any, of these [forces] may have been present in the subject vehicle or whether these forces were capable of generating the number of Newtons in the proper direction needed to cause the shifter to self-slip into reverse." *Id.* at 1181. Without expert evidence of causation, the district court granted summary judgment, and the Tenth Circuit affirmed. *Id.*

Certainly the facts and issues in *Roe* are strikingly similar to those here. But the Tenth Circuit's decision in *Roe* was based, in part, on the fact that there was <u>no</u> evidence that "a shifter could slip into reverse from false park without a manual nudge after sufficient time." *Id.* at 1181. Specifically, the expert in *Roe* "admitted that he could not recall a result of the shifter self-slipping into reverse after more than seven to eight seconds," and his "report only referenced

---

[8] Plaintiff does not meaningfully wrestle with *Roe*, arguing the Court already rejected *Roe* in connection with Defendant's summary judgment motion, and should do so again. But circumstances have changed. When the Court declined to grant summary judgment on causation, it did so in part because both Mr. Hanneman and Mr. Hille were expected to testify at trial. (Doc. No. 228 at 20–28.) As noted above, Plaintiff deep-sixed Mr. Hille at trial. Thus, the Court must consider the application of *Roe* in light of Plaintiff's actual presentation of evidence, at trial.

instances in testing where he manually shifted the car from false park to reverse…and his deposition indicated that he could not remember if he had a result where the shifter self-engaged into reverse after the requisite time." *Id.* The *Roe* court concluded that because "the experts…failed to use any additional testing of their own or by others or other independent evidence to demonstrate that the shifter could remain in a false-park position and slip on its own into reverse after sufficient lag in time, *they [did] not demonstrate[ ] that their second hypothesis was even possible*—let alone highly probable." *Id.* at 1183 (emphasis added).

By contrast here, Mr. Hanneman testified that Mr. Hille's testing resulted in at least one instance (out of 50) where the transmission slipped from false park to reverse due to engine vibrations. (Doc. No. 303 at 235:12–17.) Additionally, Defendant's own expert admitted the bushings wear over time and can become dislodged. (Doc. No. 306 at 1199:5–1201:20 (Mr. Mauldin's testimony).) And he admitted that when bushings become worn and dislodged, they can cause the shifting mechanism to land on "false park." (*Id.* at 1199:5–1201:20).). Mr. Mauldin also admitted that "one of the potential effects of looseness in the Ford shift system is unintended vehicle movement." (*Id.* at 1201:4–7.) And the evidence showed Plaintiff's vehicle did indeed have a loose bushing. (*Id.* at 1118:21–23 (Mr. Fyie acknowledging in Plaintiff's vehicle had a loose bushing).)

Additionally, in *Roe*, the court expressly noted the experts' failure to establish "a reasonable probability that there was sufficient time for Roe to get behind the vehicle after placing it into false park before it would slip into reverse." *Id.* at 1180. But here, Plaintiff's experts relied on several other pieces of evidence—including the position that first responders found Plaintiff in, as well as the location of her injuries—to opine that Plaintiff must have fallen

and laid there for several seconds as she described, before the vehicle rolled over her leg. Thus, while *Roe* is certainly important precedent, the evidence presented in this case is different from the evidence presented in *Roe*. Because judgment as a matter of law under Rule 50 is "cautiously and sparingly granted," *Curtis Park Grp., LLC*, 2023 WL 5625450, at *5 (quoting *Mountain Dudes*, 946 F.3d at 1130)), and because the causation evidence presented at trial does not conclusively favor Defendant, relief under Rule 50(b) is not warranted.

### B. Punitive Damages Evidence

Next, the Court considers whether the evidence with respect to punitive damages falls so clearly and convincingly in Defendant's favor that the jury's determination to the contrary must be set aside entirely, and a finding for Defendant must be made as a matter of law.

Defendant correctly notes that punitive damages require proof beyond a reasonable doubt that it engaged in willful and wanton conduct. (*See* Doc. No. 313 at 17 (quoting CRS 13-21-102(1)(a); CRS 13-25-127).) This type of award is justified when a defendant's conduct is performed with such wanton and reckless disregard that it evinces wrongful motive. *Tri-Aspen Constr. Co. v. Johnson*, 714 P.2d 484, 486 (Colo. 1986). It requires purposefulness, an awareness that the conduct is dangerous, and a disregard for the consequences. *See* CRS 13-21-102(1)(b).

Plaintiff argues the evidence presented at trial established that Defendant had long-known of the risk of unintended vehicle movement due to the bushing's ability to wear and dislodge and failed to take action. (*See* Doc. No. 325 at 16-21.) In support, Plaintiff cites various pieces of evidence that Defendant was on notice. (*Id.*)

Defendant contends each of piece of evidence is insufficient and the inferences Plaintiff seeks to draw cannot be drawn. (*See* Doc. No. 313 at 17–21; Doc. No. 341 at 11–16.)

15

Specifically, Defendant discusses the 1980 C8-02 Report, the 1993 failure mode and effects analysis ("FMEA"), the 1998 and 1999 Technical Service Bulletins ("TSBs"), the eleven customer contacts concerning unintended vehicle movement, and describes why each of these do not support Plaintiff's case.

But the jury is allowed to draw inferences from the evidence, and Defendant's arguments ask the Court to either: step into the jury's shoes to re-weigh the evidence, make credibility determinations, supplant the jury's judgment with its own (which the Court cannot do); and/or determine that the information is so irrelevant or tangentially relevant that it should not have been admitted in the first place (which the Court addresses below). Defendant's arguments as to each of these pieces of evidence does not persuade the Court that it should enter judgment in Defendant's favor as a matter of law.

Moreover, beyond this evidence, Defendant's own expert witness and corporate representative testified that Defendant knew, as far back as 1992, that the bushings could wear and slide out of place. (Doc. No. 304 at 710:6–11 (Q: "And we know that as far back as 1992, Ford was aware that these bushings would wear out or would wear such that they would be able to slide up that shifter tube out from underneath that clamp, isn't that true?" A. "I think on the previous version of the bushing, we had a test where that happened where one of the flanges wore, yes.").) He also testified that the 1999 TSB identified a problem in Ford Expeditions in which the bushing was sliding out from underneath the clamp on the shift tube. (*Id.* at 710:12– 711:18 (Mr. Fyie agreeing that the subject vehicle's make and model was included in the 1999 TSB regarding bushings sliding out of place).) This and other evidence is sufficient to support the legitimacy of the jury's apparent conclusion that Defendant had for years known about the

16

risk of unintended vehicle movement, and that such movement could—in some instances—be attributed to loose bushings. In this regard, the jury presumably concluded, among other things, that it would have been relatively simple for Defendant to address the issue, and that its failure to do so constituted reckless indifference, disregard, and dangerous behavior. Thus, the Court is unpersuaded that the jury's findings must be rejected out of hand as completely baseless. Stated differently, the Court cannot conclude as a matter of law that Plaintiff has so wholly failed to adduce sufficient facts, so as to justify overturning the verdict and entering judgment in Defendant's favor. Accordingly, Defendant's Rule 50(b) motion, is denied as to punitive damages as well.

## II.    Defendant's Motion for a New Trial

The Court's denial of Defendant's Rule 50(b) motion is not dispositive of Defendant's alternative request for a new trial under Rule 59(a). And on this alternative request, the Court is persuaded that Defendant is entitled to relief.

Defendant organizes its arguments into three buckets. First Defendant argues certain "evidentiary errors" occurred at trial. (Doc. No. 314 at 2–18.) Next, Defendant argues the Court made certain "instructional errors" at trial. (*Id.* at 22–31.) Finally, Defendant argues Plaintiff's counsel, Anthony Buzbee, made certain "misrepresentations," "improper arguments," and "prejudicial comments" during trial, specifically focusing on his closing argument. (*Id.* at 33–40.) According to Defendant, these alleged errors cumulatively require a new trial. The Court will consider each set of arguments in turn.

### A.  Evidentiary Errors

To "secure a new trial based on an allegedly improper evidentiary ruling, the movant must show that the court's evidentiary rulings were clearly erroneous and that they were prejudicial such that 'it can be reasonably concluded that with or without such evidence, there would have been a contrary result.'" *Jackson v. Potter*, 587 F. Supp. 2d 1179, 1182 (D. Colo. 2008) (quoting *Hinds v. Gen. Motors Corp.*, 988 F.2d 1039, 1049 (10th Cir. 1993)). Even then, an erroneous evidentiary ruling cannot be "grounds for granting a new trial unless the error or defect affects the substantial rights of the parties." *Stewart v. S. Kan. and Okla. RR., Inc.*, 36 F. Supp. 2d 919, 920 (D. Kan. 1999).

Prior to turning to the substance of Defendant's evidentiary arguments, the Court addresses the issue of waiver. Plaintiff repeatedly contends Defendant waived its evidentiary arguments. The Court will address each waiver challenge as appropriate throughout its discussion, but it makes the following overarching observations and findings. *First*, the Court advised the parties during the first day of trial that it did not consider an evidentiary argument waived if the parties raised it in a pre-trial motion that was denied by the Court.[9] (*See* Doc. No. 302 at 161:23–162:7 ("So with respect to instances where they are not violating a prior order of mine and all you're doing is preserving the same objection that you have already made that I have overruled and I have said I disagree with you and I'm going to let it in, I don't consider it a waiver to not object in the moment, because we have a record on the motions in limine .... So I don't find it necessary.").) Thus, the Court will not find waiver when Defendant filed a motion in

---

[9] The Court notes this direction was given after Plaintiff's counsel complained about the number of objections made by Defendant during the first day of trial. (*See* Doc. No. 302 at 159:5–8 ("Another issue is the objections interrupting counsel's examination taking up time from the limited amount of time that we have, how can we handle that moving forward, your Honor?").)

limine directly addressing the issue in question, objected accordingly at least once during trial, and it was clear that any further objections at trial would have been futile. *See United States v. Pablo Varela-Rivera*, 279 F.3d 1174, 1178 (9th Cir. 2002) (requiring a party to engage in a "futile and formalistic ritual" of objecting contemporaneously to disputed evidence after the court denied a pretrial motion "would have the perverse result of making form the master of substance"); *see also Kehr v. Smith Barney, Harris Upham & Co.*, 736 F.2d 1283, 1286 (9th Cir. 1984) (noting "constant objections ... could antagonize the jury"); *State Farm Mut. Auto. Ins. Co. v. Goddard*, 484 P.3d 765, 779 (Colo. Ct. App. 2021) ("A court's definitive ruling on a motion in limine preserves the issue for appeal.").

*Second*, Defendant has not waived an argument by engaging with evidence or testimony the Court admitted over Defendant's objection. *See* Waiver of objection, 1 *McCormick On Evid.* § 55 (8th ed.) ("However, when her objection is made and overruled, she is entitled to treat this ruling as the 'law of the trial' and to negatively rebut or explain, if she can, the evidence admitted over her protest. Consequently, as a general rule there is no waiver if she cross-examines the adversary's witness about the matter. There is also no waiver even though the cross-examiner repeats the fact or even meets the testimony with other evidence which, under the theory of her objection, would be inadmissible."); 1 Michael H. Graham, *Handbook of Federal Evidence* § 103.4, at 45–6 (5th ed. 2001) ("However, the party may ... himself bring out evidence ruled admissible over his objection to minimize its effect without it constituting a waiver of his objection"). For example, the Court will not find waiver simply because Defendant cross-examined Plaintiff's witnesses about evidence that drew an objection from Defendant.

19

With that, the Court turns to the substance of Defendant's arguments, and the alleged evidentiary errors.

### 1.  Mr. Hannemann's Testimony Regarding Mr. Hille's Testing

Defendant argues the Court erred in allowing Mr. Hannemann to testify about the exemplar testing conducted by Mr. Hille. (Doc. No. 314 at 2–6.) Defendant's argument is essentially two-pronged. First, Defendant argues Mr. Hannemann's testimony regarding Mr. Hille's exemplar testing violated Federal Rule of Evidence 703 because Mr. Hannemann acted as a simple "mouthpiece" for Mr. Hille, who was, in turn, shielded from cross-examination. (*Id.* at 2–4.) Second, Defendant argues that even if the Court declines to find a Rule 703 issue, Mr. Hannemann's testimony regarding Mr. Hille's testing nevertheless ran afoul of Rules 401, 403, and 702 because Plaintiff failed to establish any evidence at trial that the exemplar testing was done under conditions "substantially similar" to the incident in question. (*Id.* at 4–5.)

In response, Plaintiff argues Mr. Hannemann did not serve as Mr. Hille's mouthpiece, and instead properly relied on Mr. Hille's testing in forming his own expert opinion. (Doc. No. 326 at 4–9.) Plaintiff also appears to argue she did not need to show substantial similarity between Mr. Hille's testing and the subject incident, because she never sought the admission of the tests into evidence.[10] (*Id.* at 8.)

---

[10] Plaintiff also contends Defendant has waived its argument, but this contention is unavailing. The admission of Mr. Hille's exemplar testing and Mr. Hanneman's testimony as to the same were the subject of Defendant Rule 702 motions. (*See* Doc. No. 154 at 12–21; *see also supra* at 18–19. Moreover, the transcript shows Defendant objected prior to and following Mr. Hanneman's testimony regarding Mr. Hille's testing. (*See* Doc. No. 303 at 232:17–21, 235:21–22 (noting that prior to Mr. Hanneman's testimony Defendant "object[s] under Rule 703," because Mr. Hanneman "wasn't involved" or "even there" for Mr. Hille's testing, and then re-raising the objection following the testimony).)

During trial, Mr. Hannemann testified as follows regarding Mr. Hille's exemplar testing:

**Plaintiff's counsel**: Mr. Hannemann, your colleague, Mr. Hille, performed some testing on an exemplar vehicle, correct?

**Mr. Hanneman:** Yes.

**Plaintiff's counsel**: Briefly, tell us about that testing because we don't have much time.

**Mr. Hanneman**: I have shown you, on this column, how you can do these things. But every vehicle is different. There's other components, there's friction, vibration, things going on in the vehicle. And what Mr. Hille did is he took a running vehicle, an exemplar vehicle, and he was easily able to put it in the false-park condition. And he repeated this 50 times. And in one of those cases, he did have a situation where the vehicle did drop into reverse, just based on the vehicle running, sitting still. It didn't happen every time.

**Plaintiff's counsel**: Based on this testing, is it your opinion that the engine vibration caused the gear selector to slip back into reverse after it was in the false-park position?

...

**Mr. Hanneman**: Yes.

**The Court**: Mr. Hannemann, you didn't do the actual testing; is that right?

**Mr. Hanneman**: That's correct.

...

**Plaintiff's counsel**: And you relied on this testing that your colleague performed, correct?

**Mr. Hanneman**: Yes.

(Doc. No. 303 at 235:3–236:6.)

"An expert witness is permitted to use assistants in formulating his expert opinion, and normally they need not themselves testify." *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002). Indeed, an expert may base part of his opinion on what a

different expert believes, without necessarily requiring the underlying expert to testify at trial. *Id.*
(citing Fed. R. Evid. 703). However, when "the soundness of the underlying expert judgment is
in issue" the Court's analysis must change, and the underlying expert's testimony may be
necessary. *Id.* In other words, if there is a question about the underlying expert's work, the
testifying expert cannot "merely parrot what the other expert said, vouch for that expert, or
become that expert's 'spokesman.'" *HealthOne of Denver, Ind. v. UnitedHealth Grp. Inc.*, 2012
WL 94678, at *6 (D. Colo. Jan. 12, 2012) (citing *Dura*, 285 F.3d 613). Moreover, the Tenth
Circuit has held that an expert may not rely on the work of another expert when "there is no
indication in the record that [the expert] had any familiarity with the methods or reasoning used
by [the underlying expert]." *TK-7 Corp. v. Est. of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993).

     Here, the Court finds Mr. Hannemann improperly acted as Mr. Hille's mouthpiece in
testifying about Mr. Hille's exemplar work. First, and as the Court previously expressed, there
are fair concerns and criticisms of Mr. Hille's judgment, work, and tests. (*See* Doc. No. 228 at
24–28 (noting the "differences between [Mr. Hille's] exemplar and the subject vehicle," an
"issue with the shift cable popping off the lever on the [exemplar's] transmission (which seems
problematic in a case that concerns improper shifting and movement)," and questions about the
vehicle upon which the exemplar test was conducted).) However, the Court believed those
concerns could be addressed during cross-examination, at trial. (*Id.* (finding the exemplar
"substantially similar to the subject vehicle" and determining any differences between the
exemplar and the subject vehicle—or Mr. Hille's knowledge gaps as to the same—could be
highlighted *during the cross-examination of Mr. Hille*).) But of course, Mr. Hille never showed
up trial.

Second, Mr. Hannemann had no first-hand knowledge of Mr. Hille's testing methodology or the characteristics of the exemplar vehicle. (*See* Doc. No. 303 at 257:1–25 (in which Mr. Hannemann says the "[t]esting I have relied on was done by...Hille" and acknowledging he has never seen the exemplar used by Mr. Hille).) Moreover, Mr. Hannemann did not testify that he reviewed photos or video of the exemplar testing. (*See* Doc. No. 154-7 at 56: (Mr. Hille stating during his deposition that "we weren't set up for videos and everything" during his work on the exemplar vehicle); *see also* Doc. No. 359 at 2 (noting "Plaintiff has not found any trial testimony where Hannemann specifically mentioned the photographs taken of the exemplar Expedition testing").) Further, Mr. Hille was not a simple "gofer or data gatherer" for Mr. Hannemann. *Dura*, 285 F.3d at 613. By Plaintiff's own description, Mr. Hannemann is an "automotive design engineer expert" (Doc. No. 303 at 190:19–20), and Mr. Hille "addresses different aspects of the analysis." (Doc. No. 162 at 37.) Thus, Mr. Hannemann did not merely incorporate Mr. Hille's conclusions into his analysis, as Plaintiff contends. To the contrary, as demonstrated by the excerpts reproduced above, Mr. Hannemann simply regurgitated Mr. Hille's exemplar testing results and opinions, and in this way, Plaintiff improperly used Mr. Hannemann as a "screen against cross-examination" for Mr. Hille. *Matter of James Wilson Assocs.*, 965 F.2d 160 (7th Cir. 1992).

Had the Court known Mr. Hille would not testify, it—at a minimum—would not have allowed Mr. Hanneman to offer hollow opinions about Mr. Hille's testing. Allowing Mr. Hanneman to testify as to Mr. Hille's exemplar testing was therefore in error and caused

significant prejudice to Defendant. Moreover, because this testimony goes to the heart of

Plaintiff's causation case, this error alone warrants a new trial.[11]

### 2. Expert Testimony Regarding L.T.'s Alleged Statements

Next, Defendant argues it was prejudiced when Plaintiff's experts testified about L.T.'s

alleged statements concerning the subject incident. (Doc. No. 314 at 6–8; 340 at 13–15.) In its

Motion and Reply, Defendant raises the following testimony:

- When asked, Plaintiff's expert Kevin Vosburgh explained L.T.'s statements as a basis for his animation showing a "five or six second[ ]" delay between Plaintiff exiting the vehicle and it rolling backward. (*Id.* at 7 (citing Doc. No. 302 at 100:9, 121:15–16).)

- Mr. Vosburgh stated "Ms. Thompson and her grandson said that her head was more towards the mailboxes and her feet were more towards her house." (Doc. No. 340 at 14 (citing Doc. No. 302 at 85:1–3).)

- Mr. Hanneman testified L.T. told him it took "about six seconds" for the car to roll backward and that L.T. jumped out of the vehicle while it was rolling. He further testified this was "basically the same thing" L.T. had told Mr. Hille. (*Id.* (citing Doc. No. 303 at 199:11–200:22).)

Defendant also notes Plaintiff's counsel referenced L.T.'s statement during closing argument.

(*Id.* (citing Doc. No. 308 at 1592:1–2 ("Her grandson told the experts how she fell.")).)

 "Federal Rule of Evidence 703 authorizes an expert to testify to an opinion even if that

opinion is based on otherwise inadmissible facts or data, which at times may include out-of-court

... statements." *United States v. Pablo*, 696 F.3d 1280, 1288 (10th Cir. 2012). "Although an

---

[11] By now it should be clear that in any new trial Mr. Hille will need to testify in order for Plaintiff to satisfy her causation burden. However, Plaintiff's failure to call Mr. Hille during the first trial raised meaningful doubts for the Court. Thus, ahead of a new trial, the Court will conduct a *Daubert* hearing. Mr. Hille shall be present to discuss his qualifications, methodology, principles, and opinions, and the Court will determine whether his testimony meets the reliability threshold. For that reason, the Court declines to address Defendant's arguments concerning the exemplar's substantial similarity, or reconsider its prior 702 rulings, at this time.

expert often will not disclose this otherwise inadmissible information to a jury, Rule 703 permits disclosure to the jury if 'the court determines that [its] probative value in assisting the jury to evaluate the expert's opinion substantially outweighs [its] prejudicial effect.'" *Id.* (quoting Fed. R. Evid. 703).) However, the disclosure of this otherwise inadmissible information is to assist the jury in evaluating the expert's opinion, not to prove the substantive truth of the otherwise inadmissible information. *Id.* Moreover, an expert cannot act as a simple "conduit for hearsay." *Bischoff v. Am. Fam. Ins. Grp.*, 2016 WL 9735735, at *2 (D. Colo. Aug. 9, 2016) (quoting *Williams v. Illinois*, 567 U.S. 50, 80 (2012)).

During the Final Pretrial Conference, the Court denied Defendant's hearsay-based motion in limine that sought to prevent Plaintiff's experts from discussing L.T.'s alleged statements during their testimony. The Court found Rule 703 permitted Plaintiff's experts to "rely on [L.T.'s statements] and discuss them," even if the statements themselves were inadmissible hearsay. (Doc. No. 225 at 23:16–17 (citing *Pablo*, 696 F.3d 1280).) The Court further noted L.T.'s statements were relatively minor portions of Mr. Vosburgh and Hille's reports. (*Id.* at 23:18–24; *see id.* at 22:19–23:24.)

On this issue, the Court sees no reason to amend its pre-trial analysis. First, though Defendant uses the phrase, "incessant repetition," to describe Plaintiff's use of L.T.'s statements, it offers only a handful of cites to the transcript. The Court regards Plaintiff's use of the statements as relatively limited. Second, and more importantly, the Court finds the Rule 703 balancing test was satisfied here. With regard to Mr. Vosburgh's testimony concerning the

animation,[12] which included a "five to six second[ ]" delay between the time Plaintiff exited the vehicle and the time it began rolling backward (Doc. No. 302 122:19–21), L.T.'s statements were central to that testimony and therefore of high probative value.[13] And because Mr. Vosburgh relied on more than L.T.'s statements, their prejudicial effect, if any, was relatively minimal. Specifically, Mr. Vosburgh relied on Plaintiff's testimony and the evidence showing Plaintiff's physical position after she fell, to determine there must have been a 5–6 second delay. (Doc. No. 302 at 85:6–87:3.) Moreover, it was arguably to Defendant's benefit that the jury was informed about L.T.'s statements because it allowed Defendant to chip away at the weight and reasoning behind the delay, including by emphasizing that L.T.—a supposed key witness—never showed up at trial.[14] Thus, Mr. Vosburgh's testimony about L.T.'s statements is not a basis for finding error that warrants a new trial.[15]

### 3. Foundation for Mr. Vosburgh's Animation

---

[12] The Court notes Defendant separately challenges the Court's decision to allow this animation to be played. (*See* Doc. No. 314 at 12–13.) The Court will address that argument, below. *See infra* at 27–29.

[13] Moreover, at least some of the testimony regarding L.T.'s statements was admitted *after* Defendant challenged the foundation for Mr. Vosburgh's animation. (*See* Doc. No. 302 at 118:1–120:17 (a sidebar during which, at Defendant's request, the Court directed Plaintiff to "[l]ay the foundation for the five-second delay"); *id.* at 121:3–16 (Vosburgh testifying that L.T.'s statements were a basis for the animation's timing in depicting the vehicle's backward roll).)

[14] Notably, the Court also denied Plaintiff's *motion in limine* seeking to preclude the admission of the police report from the subject incident—a report that never mentioned L.T. as an eyewitness, and that could have been used by Defendant to undercut L.T.'s statements and Mr. Vosburgh's reliance on the same. (*See* Doc. No. 225 at 58:4–61:7.)

[15] Defendant also appears to argue the Court committed error in allowing Mr. Hanneman to testify as to what L.T. told Mr. Hille. The Court finds this issue adequately covered by the preceding analysis.

Defendant next argues "various aspects" of the animation presented by Mr. Vosburgh lacked proper foundation.[16] (*See* Doc. No. 314 at 12–13.) Specifically, Defendant contends: 1) the animation "depicted the PRNDL indicator moving to P for Park as the driver shifted" but there was no evidence the PRNDL indicator pointed at Park when Plaintiff exited the vehicle; 2) there is no foundation for the "five-second delay between Plaintiff exiting the vehicle and it moving"; and 3) "[t]here is no foundation for the way that the animation depicts the driver falling to the ground." (Doc. No. 314 at 12–13.) In response, Plaintiff argues Defendant failed to preserve its arguments regarding the PRNDL's presentation in the animation or how the animation depicts Plaintiff's fall. (Doc. No. 326 at 15.) Plaintiff further argues she laid proper foundation for the delay. (*Id.* at 13–14.)

Defendant filed a pre-trial motion in limine seeking to preclude any use of the animation at trial "until the Court has conducted a jury-out hearing to determine whether Plaintiff has laid adequate foundation for the animation." (Doc. No. 191 at 1.) In that motion, Defendant argued there were seven specific ways the animation lacked foundation—including a lack of foundation for the PRNDL graphic, how it depicted Ms. Thompson falling from the vehicle, and the delay prior to the vehicle rolling backward. (*Id.* at 4.) The Court granted the motion in part, and denied it in part, finding that while the animation *might* "unduly and unfairly influence jurors," and for that reason it could not be played during opening, the animation amounts to a demonstrative that illustrates Plaintiff's theory of the case. (Doc. No. 119 at 7–8.) Thus, so long as Plaintiff laid a foundation, the animation would be permitted. (*Id.*)

---

[16] The animation was created by non-witness third-party Fox Animation at Mr. Vosburgh's request.

27

Defendant also objected at trial, and during a sidebar the Court considered the foundation

issues again. (*See* Doc. No. 302 at 118:1–120:8.) While the sidebar transcript shows a particular

focus on the five second delay, the Court finds Defendant—through its prior arguments and

general objections[17]—adequately preserved all three foundation-based arguments regarding the

animation. Thus, the Court moves on to consider the substance of Defendant's foundation

argument.

Contrary to Defendant's assertion, there was adequate foundation for the animation's

depiction of the delay and the manner in which Plaintiff fell to the ground. *See generally United

States v. Golden,* 671 F.2d 369, 371 (10th Cir. 1982) ("Trial judges have discretion to decide

whether an adequate foundation has been laid for the admission of evidence.") As to the five-

second delay, Mr. Vosburgh testified that Plaintiff told him she "got out of the vehicle while it

was stationary, that she slipped, fell onto her backside and hit the back of her head," and that she

was "on the ground for two or three seconds" before being run over. (Doc. No. 302 at 100:2–11.)

Likewise, he testified that L.T. told him Plaintiff "was out of the car, on the ground for five or

six seconds" prior to being run over.[18] (*Id.* at 121:15–16.) He also testified that Plaintiff's

---

[17] E.g., "there's not foundation to all of it," "[t]hey're still not there foundationally," [t]here's no
foundation," and "[w]e renew our objections." (Doc. No. 302 at 118:18, 119:4, 120:5–7; 122:1.)

[18] Defendant also argues Mr. Vosburgh testified "he was not the person who instructed the
animators to include the delay," and did not testify that he had any opinion to a reasonable
degree of engineering certainty about how long the subject vehicle remained stationary prior to
rolling backward, and thus there was no expert basis for the delay. (Doc. No. 314 at 12–13.) But
this argument is too stretched. On cross examination, when asked if he had an opinion "to a
reasonable degree of engineering certainty how long the Expedition stayed stationary after Ms.
Thompson exited," Mr. Vosbrugh responded, "[w]ell, I know that it was at least a minimum
amount of time," before later saying it was "[f]our or five seconds." (Doc. No. 302 at 128:3–9.)

position on the ground confirmed Plaintiff's version of the incident, which includes slipping on ice and a delay between falling and being run over. (*Id.* at 85:6–87:3.) Defendant may find these bases weak, but that criticism goes to the weight of the evidence, not foundation for this demonstrative. (Doc. No. 302 at 119:25–120:4 (the Court noted during the sidebar that Defendant was able to cross-examine Mr. Vosburgh about the animation and highlight any weakness).)

As to foundation for the position shown on the PRNDL indicator, that too was based on Plaintiff's version of the events. And though this appears to be a closer call because there is no confirming evidence for this specific image (such as L.T.'s statements, or the position Plaintiff was in after falling), foundation for a demonstrative does not require multiple proofs. Moreover, the position of the PRNDL indicator is one part of an interconnected series of events leading up to the incident. Mr. Vosburgh reconstructed the incident, along with the series of events leading up to the incident, and the animation depicted those same events. Thus, Mr. Vosburgh's testimony was adequate foundation for the challenged portions of the animation. *See generally Dahlberg v. MCT Transp., LLC*, 571 F. App'x 641, 647 (10th Cir. 2014) ("In assessing foundation in this context, courts consider (among other things) whether the proffered demonstrative exhibit 'fairly and accurately summarize[s] previously admitted competent evidence.'" (quoting *Wilson v. United States,* 350 F.2d 901, 907 (10th Cir. 1965)).

### 4. The NHTSA C8-02 Report

Defendant's next evidentiary argument concerns the National Highway Transportation and Safety Administration ("NHTSA") C8-02 report admitted at trial. Defendant's argument is two pronged. First, Defendant argues the Court erred in denying its motion in limine and

allowing Plaintiff to introduce the report into evidence because it is "irrelevant and noncompliant

with Rule 403." (Doc. No. 314 at 13–14.) Second, Defendant argues the manner in which

Plaintiff used the report at trial was prejudicial and violated the Court's order on its motion in

limine. (Doc. No. 314 at 14–15.) Plaintiff responds by arguing the report was properly admitted,

incorporating its pre-trial argument on the issue. (Doc. No. 326 at 15.) She further argues her use

of the report was consistent with the Court's pre-trial order.[19]

The C8-02 report, issued by NHTSA's Office of Defects Investigation in June 1980, was

the result of an investigation into reports of unintended movement by Ford vehicles. (*See* Doc.

No. 188-1); *see also Ctr. for Auto Safety, Inc. v. Lewis*, 685 F.2d 656, 657 (D.C. Cir. 1982)

("[The C8-02 report] was prompted by reports that the automatic transmissions in the Ford cars

caused many accidents by failing to hold or engage in Park and slipping into Reverse gear,

commonly when the driver was outside the vehicle and thus unable to control the unexpected

movement."). "The investigation dealt with 23 million vehicles, dating back to 1970, equipped

with five major types of automatic transmissions, and over twenty types of transmission control

systems." *Lewis*, 685 F.2d 659–60. The report states, "NHTSA has received reports of over

twenty-three thousand failures from Ford Motor Company, and from consumers...regarding

problems of inadvertent vehicle movement on Ford built vehicles," and on "June 19, 1980

NHTSA made its 'initial determination' under 15 U.S.C. § 1412 that a safety-related defect

---

[19] Plaintiff also argues Defendant waived any objection to the C8-02 report. However, there is no
question Defendant objected in a motion in limine and renewed this objection during trial. (*See*
Doc. No. 188; Doc. No. 303 at 241:20–21 (noting the admission of the C8-02 report was "subject
to our (Defendant's) prior objection, our motion in limine").) Accordingly, the Court finds this
argument was not waived.

existed in the Ford vehicles." *Id.* However, "[w]ithout making a final determination that a defect

existed, the Secretary settled the case by requiring Ford to send warnings to the owners of the

relevant vehicles, together with cautionary stickers to be attached to the dashboards of their

automobiles." *Id.* at 657.

Prior to trial, Defendant challenged the admission of the C8-02, arguing it concerned a

different purported defect found in different types of transmissions than the one at issue in this

case. (Doc. No. 188 at 4–5 (saying the report was an investigation into movement caused by "the

force of the park apply rod spring in the transmission exceed[ing] the force of the detent spring

on the transmission's inner manual lever" and involved "Ford C-3, C-4, FMX and JATCO

automatic transmissions," not the 1998 Expedition's 4R70W transmission).) However, the Court

ultimately determined the report "goes to notice because it concerns unintended vehicle

movement, and while the investigation concerns different and much older vehicles, Defendant

can easily explain that to the jury and the distinction goes to the weight of the evidence, not its

admissibility." (Doc. No. 219 at 7; *see* Doc. No. 188 (Defendant's motion in limine).)

Upon further review, the Court continues in its belief that the C8-02 report is relevant. As

Mr. Hanneman testified, the report shows "some similarities" between the "designs from 1980"

and the subject vehicle, and "they also identified that engine vibration can be an issue that can

help to exacerbate the park-to-reverse." (Doc. No. 303 at 242:16–22.) These were issues squarely

at the center of Plaintiff's defect case.

However, in the context in which it was offered, and having the benefit of a full trial

presentation, the Court is now highly skeptical that its probative value outweighs its prejudicial

effect. Specifically, the *manner* in which the C8-02 report was used, was prejudicial and contrary

to the Court's order. Plaintiff's repeated references to the "23,000" complaints noted in the report, including "2,252 accidents, some with property damage, 703 with injures and 42 fatalities," served as a back door for other similar incident ("OSI") evidence, which the Court expressly disallowed. (Doc. No. 303 at 245; *see* Doc. No. 303 at 13–14; Doc. No. 305 at 759:21–25; Doc. No. 306 at 1137:14–16; Doc. No. 307 at 1384:23–1385:3, 1388:16–20; Doc. No. 308 at 1601:8–9, 1669:19–20; *see also* Doc. No. 308 at 1601:12–13).) The Court limited Plaintiff to 11 OSIs. By using the C8-02 report to reference other complaints, accidents, and fatalities, Plaintiff violated the Court's OSI order. (*See* Doc. No. 219 at 7; Doc. No. 219 at 7 ("As to any remaining complaints/OSIs beyond the 11 identified in Mr. Fyie's deposition, no witness—expert or otherwise—may testify to them, because Plaintiff has not satisfied her burden of demonstrating substantial similarity.").)

Thus, while the Court does not find error in the admission of the C8-02 report, it will not, during a new trial, permit repeated references to the 23,000 incidents. The Court reserves judgment on whether the report must be excluded altogether under Rule 403.

### 5. OSI Evidence

Defendant next argues it was prejudiced by the admission and Plaintiff's use of OSIs. The Court granted in part and denied in part Defendant's pre-trial motion in limine to preclude OSI evidence. (Doc. Nos. 186; 219.) The Court determined that 11 OSIs, which had been discussed during the deposition of Defendant's corporate representative, Matthew Fyie, could be admitted "to demonstrate notice of the alleged unintended vehicle movement concerns." (Doc. No. 219 at 7.) The Court reasoned,

> Plaintiff has satisfied her burden of showing substantial similarity because the 11
> OSIs involve allegations of unintended vehicle movement and the same make and

model. Additionally, Plaintiff's identification of the 11 OSIs gave Defendant an
opportunity to consider the similarities and differences associated with those 11
OSIs, which means Defendant will have an opportunity to address any concerns
during direct and cross. Thus, any prejudice is minimized and outweighed by the
probative value of the information.

(*Id.*) The Court warned, however, that Plaintiff could only use these OSIs "to demonstrate *notice*
of the alleged unintended vehicle movement concerns," not for the truth of the matter asserted in
the OSIs. (*Id.*) Finally, the Court noted, "[a]s to any remaining complaints/OSIs beyond the 11
identified in Mr. Fyie's deposition, no witness—expert or otherwise—may testify to them,
because Plaintiff has not satisfied her burden of demonstrating substantial similarity." (*Id.*)

Defendant's OSIs argument is essentially three-pronged. First, Defendant argues "[t]he
evidence at trial demonstrated the Court's pretrial finding of substantial similarity was an abuse
of discretion." (Doc. No. 314 at 15.) Second, Defendant contends the Court failed to adhere to its
motion in limine order when issuing its limiting instruction to the jury regarding the OSIs. (*Id.* at
316.) Finally, Defendant argues Plaintiff "improperly used the OSI evidence" by repeatedly
implying there were numerous OSIs (far beyond the 11 she was allowed to reference),
introducing OSI evidence not related to the admissible 11, and by making prejudicial comments
during her opening and closing statements. (*Id.* at 16–18.)

Plaintiff responds by arguing the 11 OSIs were properly used as notice evidence, and
denying that she injected prejudicial comments or implied there were more than 11 OSIs.[20] (Doc.
No. 326 at 17–20.)

---

[20] Plaintiff also intersperses certain waiver-related arguments (Doc. No. 326 at 17–20), but the
Court finds these arguments either unavailing or directed at arguments made by Defendant which
were not ultimately relevant to the Court's analysis. (*See, e.g.*, Doc. No. 326 at 17 (arguing
Defendant should be precluded from arguing that certain customer complaints were not

At the outset, the Court declines to reconsider its pre-trial order allowing the admission of the 11 OSIs discussed at Mr. Fyie's deposition. In so doing, the Court re-incorporates and re-affirms its prior analysis that these OSIs were sufficiently similar to the subject incident under a notice theory. (Doc. No. 219 at 7); *see Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1246, 1248 (10th Cir. 2000) ("[A] high degree of similarity [is required] when plaintiffs offer other accident evidence to prove causation in their case, but ... a lesser degree of similarity [is required] when evidence of other accidents is offered to show the defendant had notice of potential defects in its product...."To be admissible on the theory of notice, the incidents must be similar enough to the event in question that they would have alerted the defendant to the problem or danger at issue.").

Still, Plaintiff's *use* of the OSI evidence exceeded the Court's pre-trial order. Plaintiff was allowed to present evidence of 11 OSIs, but on multiple occasions Plaintiff implied there were far more than 11 OSIs at issue in this case. (*See* Doc. No. 314 at 17 (collecting incidents) (citing Doc. No. 302 at 39:2–4 (promising that Plaintiff would "offer up documentation to show [the jury] that Ford received complaint after complaint after complaint after complaint after complaint—and I can keep on going"); *id.* at 39:10–11 ("it happened over and over and over and over and over and over and over and over"); *id.* at 49:12–13 (claiming that Ford was "being told time and time and time and time again" about alleged problems); Doc. No. 308 at 1602:24–1603:5 ("Remember, we went through in great detail these other incidents . . . I had—you were probably getting tired of it, like how many are you going to go through, Tony. . . . It's the same things over and over. They thought it was in park, it rolls back and either almost kills

substantially similar because they mention a recall because such an argument was not made in Defendant's pretrial motions nor at trial.).)

34

somebody, hurts somebody or almost does.")).) These statements, in combination with Plaintiff's

repeated references to "23,000" customer reports in connection with the C8-02 report (*see supra*

at 30–32), created the impression that hundreds or thousands of similar incidents had been

reported. This significantly exceeded the 11 OSIs actually admitted into evidence by the Court,

likely created undue prejudice against the Defendant, and may have unfairly influenced the

jury.[21]

      Moreover, Plaintiff presentation of the OSI evidence occasionally included gratuitous

commentary about other incidents, such as whether persons involved were injured or killed. (*See,*

*e.g.*, Doc. No. 308 at 1603:16–17, 1670:4 (during closing argument, twice referencing an alleged

incident in which "a woman broke nine ribs, a leg and an arm"); Doc. No. 307 at 1374:11–12

(asking Defendant's expert Dr. Harley whether she is working for Ford on a case "where the

vehicle rolled into a pond and a little girl drowned").) This commentary was excessive and

exceeded the scope of the Court's ruling, which limited the Plaintiff to using the 11 OSIs solely

to establish the Defendant's *notice of unintended movement in its vehicles*. And while the record

demonstrates these comments were inserted relatively sparsely, there is no question their

---

[21] Defendant also argues the Court's limiting instruction to the jury regarding the OSIs failed to
"clarify[ ] for the jury that the other incidents were offered only for notice," violating the Court's
pretrial order. The Court agrees, but on this issue Plaintiff's waiver argument is persuasive.
During a sidebar at trial, the Court and parties agreed the limiting instruction would advise the
jury that the OSIs were "not necessarily substantiated complaints," but the Court declined "to tell
[the jury] how to consider the evidence." (Doc. No. 304 at 697:1–23.) Defendant says this was in
error, and as noted already the Court agrees. However, the transcript does not indicate that
Defendant objected to the Court's statement that it would not tell the jury how to consider the
evidence, nor that Defendant objected to the actual instruction. (Doc. No. 304 at 696:18–698:20.)

35

provocative nature could have unduly influenced the jury.[22] Accordingly, the Court finds

Plaintiff's use of the OSI evidence was improper and also warrants a new trial.[23]

### B. Instructional Errors

Plaintiff next argues the Court erred by failing to include certain jury instructions. A Rule

59(a) motion predicated on instructional errors "is directed to the sound discretion of the Court,

and the Court will grant such relief only upon a showing that, due to substantial errors in the

instructions given, the trial was not fair to [the moving party]." *Xtreme Coil Drilling Corp. v.*

*Encana Oil & Gas (USA), Inc.*, 958 F. Supp. 2d 1238, 1245 (D. Colo. 2013) (citing *Montgomery*

*Ward & Co. v. Duncan,* 311 U.S. 243, 251 (1940)). "When the adequacy of a jury instruction is

challenged, 'we consider all the jury heard, and from the standpoint of the jury, decide not

whether the charge was faultless in every particular, but whether the jury was misled in any way

and whether it had understanding of the issues and its duties to determine these issues.'"

---

[22] Indeed, based on the jury's exceptionally high punitive damages award, the Court suspects it did. *See Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1121 (10th Cir. 2004) (noting that an excessive punitive damage award may "raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial." (quoting *Telecor Communications, Inc. v. Southwestern Bell*, 305 F.3d 1124, 1143 (10th Cir. 2002)).

[23] Defendant also argues the Court erred in allowing "unsubstantiated, speculative, and improper testimony regarding out-of-park alarms." (Doc. No. 314 at 8–12.) However, because the Court finds sufficient grounds for a new trial regardless of its analysis on this argument, and because any new trial in this case will not include out-of-park alarm testimony as the Court granted Defendant summary judgment on Plaintiff's failure-to-warn claim, the Court declines to address this argument. Similarly, the Court declines to address Defendant's argument that it suffered prejudice based on delayed disclosure of information by Plaintiff's experts. (*Id.* at 18–22.) The Court finds sufficient grounds for a new trial regardless of any analysis on this argument, and will address any request the parties make concerning supplementation of expert reports in connection with a new trial.

*Haberman v. The Hartford Ins. Grp.*, 443 F.3d 1257, 1274 (10th Cir. 2006) (quoting *Mason v. Oklahoma Turnpike Authority,* 115 F.3d 1442,1454 (10th Cir. 1997)).

In product liability actions, Colorado Revised Statute § 13-21-403 creates certain rebuttable presumptions. As is relevant to Defendant's arguments and this case, these presumptions include:

> (1) In any product liability action, it shall be rebuttably presumed that the product which caused the injury, death, or property damage was not defective and that the manufacturer or seller thereof was not negligent if the product:
> ...
>
> > (b) Complied with, at the time of sale by the manufacturer, any applicable code, standard, or regulation adopted or promulgated by the United States or by this state, or by any agency of the United States or of this state.

and:

> (3) Ten years after a product is first sold for use or consumption, it shall be rebuttably presumed that the product was not defective and that the manufacturer or seller thereof was not negligent and that all warnings and instructions were proper and adequate.

C.R.S. § 13-21-403(1)(b) (the "Governmental Standards Presumption"); C.R.S. § 13-21-403(3) (the "Ten Year Presumption"). According to Defendant, the Court erred in declining to instruct the jury as to either presumption. The Court will consider each presumption in turn.

**1.    The Governmental Standards Presumption**

Defendant argues the Court erred in declining to give a Governmental Standards Presumption instruction to the jury.[24] According to Defendant, the jury should have been given

---

[24] Defendant sought the following instruction:

> "Presumptions" are legal rules based on experience or public policy. They are established in the law to assist the jury in determining the truth.

37

this instruction based on the 1998 Expedition's compliance with Federal Motor Vehicle Safety Standards ("FMVSS") 101, 102, 105, and 114. (Doc. No. 314 at 23–29.) Defendant argues FMVSS 101, 102, 105, and 114 are encompassed by § 13-21-403(1)(b)'s "broad language," and the presumption does not require that the governmental standard concern "a very specific component part." (*Id.* at 27–28.) Additionally, because FMVSS 101, 102, 105, and 114 "apply to the PRNDL indicator, parking brake, and key interlock," generally, they are sufficiently connected to Plaintiff's defect theory to trigger the presumption. (*Id.* at 28.)

On close review of § 13-21-403(1)(b), as well as FMVSS 101, 102, 105, and 114, the Court disagrees with Defendant. As Plaintiff notes, the operative word in § 13-21-403(1)(b) is "*applicable*." The question is not whether the 1998 Expedition complied with *any* FMVSS that is generally related to the alleged defect, the question is whether the 1998 Expedition complied with "any *applicable*" FMVSS. Thus, the Court is required to consider two questions. First, how must the term, "applicable," be defined? Second, are FMVSS 101, 102, 105, and 114 sufficiently "applicable" to trigger the presumption?

---

In this case, if you find that at the time Ford Motor Company sold the 1998 Expedition, (1) the product complied with any applicable code(s), standard(s) or regulation(s) of the United States or the State of Colorado or any of their agencies, then the law presumes that the shift control system was not defective, Ford Motor Company was not negligent, and the shift control system did not fail to comply with any warranty of merchantability.

You must consider this presumption together with all the other evidence in the case in deciding whether the shift control system was defective, Ford Motor Company was negligent, and the shift control system complied with any warranty of merchantability.

(Doc. No. 244 at 7.)

The Colorado Supreme Court Committee on Civil Jury Instructions' Notes on Use for its

model Governmental Standards Presumption instruction, explains:

> since the presumption relates to compliance ... with any code, standard, or
> regulation, the instruction should be given only when that code, standard, or
> regulation *specifically relates to the claimed defect*. If the code, standard, or
> regulation is of *a general nature and does not deal with the specific nature of the
> claimed defect,* this instruction should not be given.

Colo. Jury Instr., Civil 14:5 (note 3) (emphasis added).[25] In other words, a particular FMVSS

would only be applicable if it "specifically relates to the claimed defect." *Id.*

By Defendant's own admission in its previous briefing on this issue, FMVSS 105 and

114 are "performance standard[s]" applying to a vehicle's parking brake and key interlock

systems, respectively. (Doc. No. 283 at 4.) While these systems are relevant to this case

generally, they are not "*specifically* relate[d] to the claimed defect"—namely the worn and

slipping bushings in the Expedition's shift control system—and thus they do not form the basis

for a presumption instruction.

FMVSS 101, titled "controls and displays," regulates the "location, identification, color,

and illumination of motor vehicle controls, telltales and indicators," and is intended to "to ensure

the accessibility, visibility and recognition of motor vehicle controls, telltales and indicators, and

to facilitate the proper selection of controls under daylight and nighttime conditions, in order to

---

[25] This note on use is found under Colorado model civil instructions **14:5**, Presumptions—
**Noncompliance** With Governmental Standards. This *non-compliance* instruction is not at issue
in this case as there is no suggestion the Expedition *failed* to comply with a governmental
standard, and Defendant seeks an instruction noting the vehicle's *compliance*. However, the
Notes on Use for model instruction **14:5A**, Presumptions—**Compliance** With Governmental
Standards, incorporates most of the 14:5 notes on use, saying, "the Notes on Use to Instruction
14:5 are also applicable to [14:5A]." Colo. Jury Instr., Civil 14:5A.

reduce the safety hazards caused by the diversion of the driver's attention from the driving task,

and by mistakes in selecting controls." 49 CFR § 571.101 S1–S2 (FMVSS 101). As with

FMVSS 105 and 114, while certain controls and displays—namely the PRDNL and shifter—are

generally relevant to this case, this "controls and displays" standard is not "specifically relate[d]

to the claimed defect." Thus, FMVSS 101 does not form the basis for a presumption instruction.

Finally, while it comes closest, FMVSS 102 also does not form the basis for a

presumption instruction. FMVSS 102 "specifies the requirements for the transmission shift

position sequence, a starter interlock, and for a braking effect of automatic transmissions, to

reduce the likelihood of shifting errors, to prevent starter engagement by the driver when the

transmission is in any drive position, and to provide supplemental braking at speeds below 40

kilometers per hour (25 miles per hour)." 49 CFR § 571.102 S1 (FMVSS 102). By its text, the

regulation's standards on "transmission shift position sequence" and "transmission braking

effect," govern issues such as the location of the neutral position on the shifter column in relation

to drive and reverse, and engine breaking in vehicles with "more than one forward transmission

gear ratio." *Id.* at S3.1.1–3.1.2. But neither section specifically relates to the claimed defect.

Moreover, the section on starter interlock requires "the engine starter [to] be inoperative when

the transmission shift position is in a forward or reverse drive position." *Id.* at S3.1.3. But the

defect alleged here, is entirely unrelated to whether Ms. Thompson's starter was operative when

the vehicle was in drive or reverse. Indeed, one of Ford's main arguments is that Ms. Thompson

should have, but failed to, turn the vehicle off (i.e., engage the starter system) prior to checking

her mail. Thus, whether or not Ms. Thompson's starter interlock was operating properly is not

relevant to the alleged defect.

In short, while FMVSS 101, 102, 105, and 114 each bear some relation to this case, they are not regulations that "deal with the specific nature of the claimed defect." Colo. Jury Instr., Civil 14:5 (note 3).[26]

Defendant emphasizes the important public policy behind products liability case presumptions, and a 2003 amendment to § 13-21-403 which <u>requires</u> a court to give presumption instructions when "the court determines by a preponderance of the evidence that the necessary facts giving rise to a presumption have been established." (*Id.* at 22–27); C.R.S. § 13-21-403(4). The Court agrees with these points. Indeed, statutory presumptions are an important part of products liability litigation. Further, Defendant is correct that the presumptions found in § 13-21-403 are "mandatory" if sufficient evidence is produced supporting their inclusion. But Defendant has not satisfied its burden of establishing the standards are "applicable." Accordingly, the Court declines to find error on the Governmental Standards Presumption.

### 2.    The Ten-Year Presumption

Defendant next argues the Court erred in declining to instruct the jury on the Ten-Year Presumption.[27] At trial, the Court declined to give the instruction based on its reading of *Uptain*

------

[26] Contrary to Defendant's assertion, the Court is not requiring that a governmental standard regulate "a very specific component part" connected to the alleged defect—namely, the bushings—before it will give the presumption instruction. Indeed, the Court would not expect a "bushing FMVSS" to exist. However, the statute is clear that a regulation must meet a certain applicability threshold to trigger the instruction. Thus, at the very least, an FMVSS must regulate the allegedly defective *system* in a manner that specifically impacts the claimed defect. As it applies to this action, Defendant would need to point to an FMVSS that regulates the shift control system in a manner that addresses the false park and slip to reverse defect alleged by Plaintiff. FMVSS 101, 102, 105, and 114, fall short of this threshold.

[27] Defendant sought the following instruction:

*v. Huntington Lab, Inc.*, a Colorado Supreme Court case in which the court found "implicit" in

the Ten-Year Presumption's "statutory language is the assumption that no other strict liability

claims have been established against the particular product." 723 P.2d 1322, 1331 (Colo. 1986).

The Court further noted this interpretation was re-affirmed as good law in 2016 by the Tenth

Circuit in *Helmer v. Goodyear Tire & Rubber Co.* 828 F.3d 1195, 1201–02 (10th Cir. 2016).

Thus, the Court reasoned, because the jury in *Beene v. Ford Motor Company* found a defect in

the shift control system at issue in this case, the Ten-Year Presumption did not apply. (*See* Doc.

No. 308 at 1520:11–1525:2); *Beene v. Ford Motor Company*, 1:08-cv-01086-MSK-BNB.

 In its Motion, Defendant argues the Court erred in its reliance on *Uptain* and *Helmer*.

(Doc. No. 314 at 29–31.) Defendant appears to argue that because *Uptain* and *Helmer* did not

specifically consider whether to instruct a jury on the Ten-Year Presumption, their discussions of

the statute are non-binding dicta. (*Id.* at 30 (saying *Uptain* "was deciding an evidentiary ruling

regarding relevance" and *Helmer* "did not involve a challenge to an instruction on the Ten Year

---

   "Presumptions" are legal rules based on experience or public policy. They are
established in the law to assist the jury in determining the truth.

   In this case, because the 1998 Expedition's shift control system was sold for the
first time for use or consumption ten or more years before any claimed injuries,
damages, and losses were incurred by Ms. Thompson, the law presumes that the
shift control system was not defective, Ford Motor Company was not negligent,
and the shift control system was in compliance with any warranty of
merchantability, and all warnings and instructions were proper and adequate.

   You must consider this presumption together with all the other evidence in the
case in deciding whether the shift control system was defective, Ford Motor
Company was negligent, and the shift control system complied with any warranty
of merchantability.

(Doc. No. 244 at 8.)

Presumption").) Further, Defendant argues the General Assembly's addition of subsection four to § 13–21–403 somehow abrogated *Uptain*. (*Id.*)[28]

As the Court found at trial—and now re-affirms—*Uptain*'s discussion of the Ten Year Presumption is not dicta. (Doc. No. 308 at 1521:18–23.) In *Uptain*, the Colorado Supreme Court considered whether it was error to admit evidence that the defendant "had never been sued for personal injuries resulting from the use" of the product in question. *Uptain* 723 P.2d at 1329. There, the defendant "relied upon [the Ten Year Presumption] to support its position that evidence of no prior claims against its product was admissible." *Id.* The court found that,

> [i]mplicit in [the Ten Year Presumption] is the assumption that no other strict liability claims have been established against the particular product. The evidence in this case established that [the defendant's product] had been marketed for twenty-five years in its present form and that no suit had been filed against the product or against [the defendant] with respect to the product. This evidence was relevant to the question of whether [the defendant] was entitled to an instruction informing the jury of the presumption created by section 13–21–403(3) and, therefore, was properly admitted by the trial court.

*Id.*

The Tenth Circuit has described dicta as "statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand." *Rohrbaugh v. Celotex Corp.,* 53 F.3d 1181, 1184 (10th Cir.

---

[28] Defendant also argues that because "the plain language" of § 13–21–403 does not include "any exception for products that have previously been the subject of other lawsuits," the Court may not apply such an exception. (*Id.* at 29.) Defendant says, "[t]hat should be enough to end the inquiry." (*Id.*) Respectfully, this argument makes little sense. The plain language may not contain an express exception, but in *Uptain,* the Colorado Supreme Court found an *implicit* exception in the statute. While Defendant is free to argue, and does argue, that *Uptain*'s language is non-binding, the Court will not ignore *Uptain* simply because the implicit exception is—by definition—not expressly set forth in the statute.

1995). Under this definition, *Uptain*'s discussion of the Ten Year Presumption was far from

dicta. Though the *Uptain* court did not directly consider whether the jury should be instructed on

the presumption, it clearly interpreted the statute to make its evidentiary ruling.[29] Thus, far from

"statements or comments ... not necessarily involved nor essential" to deciding the issue, the

*Uptain* court's construction of the Ten Year Presumption was central to its holding.

      Moreover, in 2016, *Uptain* was recognized as good law by the Tenth Circuit in *Helmer*.

828 F.3d at 1201–02. And while Defendant is correct that the *Helmer* court was not directly

applying the *Uptain* holding, the *Helmer* court expressly contrasted the issues in *Uptain* with the

issues before it. *Id.* In other words, *Helmer*'s discussion of *Uptain* reflected the Tenth Circuit's

acknowledgment that *Uptain* was good law.

      As for the General Assembly's 2003 addition of subsection four to § 13–21–403: that

revision abrogated *Mile Hi Concrete, Inc. v. Matz*, 842 P.2d 198 (Colo. 1992), by requiring a

court to instruct a jury on the presumption—even in the face of counter evidence—so long as

"the court determines by a preponderance of the evidence that the necessary facts giving rise to a

presumption have been established." C.R.S. 13–21–403(4). But as Plaintiff points out, the Ten

Year Presumption itself—that is, the text governing its applicability—was not amended. Indeed,

that the General Assembly took the time to repudiate *Mile Hi*, but said nothing of *Uptain,* flies in

the face of Defendant's argument that the addition of subsection four abrogated *Uptain*.[30]

---

[29] Notably, *Uptain* does not cabin its interpretation as somehow limited to the facts of that case, or the particular context for the evidentiary rulings. It interpreted the statute without any limitations.

[30] Notably, in discussing the new subsection four, the *Helmer* court also said nothing to suggest that the amendment expressly or implicitly abrogated *Uptain. See Helmer*, 828 F.3d 1195 at

Accordingly, the Court declines to find error in declining to instruct the jury on the Ten

Year Presumption.[31]

### C. Mr. Buzbee's Conduct

Defendant's last set of arguments centers on the alleged "malfeasance" (*see* Doc. 314 at

39), of Plaintiff's counsel, Mr. Buzbee, particularly focusing on closing argument. (Doc. No. 314

at 33–40.) According to Defendant, Mr. Buzbee's closing argument improperly exposed the jury

to "innuendo, unadmitted facts, and personal attacks on Ford and its counsel." (*Id.* at 33–34.)

Defendant also contends Mr. Buzbee implied the jury should disregard certain instructions given

by the Court. (*Id.* at 35–37.)

In response, Plaintiff says certain arguments made by Defendant were waived due to a

lack of contemporaneous objections. (Doc. No. 326 at 33–39.) She further argues that to the

extent arguments were not waived, the conduct does not rise to the level of requiring a new trial.

(*Id.*)

As the Tenth Circuit has noted, "[a]rguments may be forceful, colorful, or dramatic,

without constituting reversible error." *Whittenburg v. Werner Enters. Inc.*, 561 F.3d 1122, 1133

(10th Cir. 2009); *see id.* ("Counsel may resort to poetry, cite history, fiction, personal

experiences, anecdotes, biblical stories, or tell jokes."). Indeed, "in the American tradition a

---

1201 ("§ 13–21–403(4) simply refers back to the preceding paragraphs, directing courts to issue an instruction on a rebuttable presumption once the facts in the relevant subsections have been demonstrated.").

[31] As with Defendant's contention that it was prejudiced by certain out-of-park alarm testimony (*see supra* n. 23), the Court declines to address Defendant's additional argument that the Court erred in not issuing a limiting instruction on the failure to warn evidence and arguments. (*See* Doc. No. 314 at 31–33.) The Court already finds sufficient grounds for a new trial regardless of any analysis on this argument, and any new trial will not include a failure to warn claim.

45

closing argument can be a quintessential example of the art of persuasion....and courts should be

cautious about imposing too stringent restrictions." *United States v. Gregory*, 54 F.4th 1183,

1210 (10th Cir. 2022), *cert. denied*, 143 S. Ct. 1756 (2023). Moreover, "a stray improper remark

in closing is no basis for upsetting a trial and requiring the parties and district court to redo their

ordeal." *Whittenburg*, 561 F.3d at 1131 (citing *King v. PA Consulting Group, Inc.,* 485 F.3d 577,

591 (10th Cir. 2007); *Garcia v. Sam Tanksley Trucking, Inc.,* 708 F.2d 519, 522 (10th Cir.

1983)).

Nevertheless,"[t]here is no question that a closing argument may deny the opposing party

a fair trial." *Gregory*, 54 F.4th at 1210; *see, e.g.*, *Lambert v. Midwest City Mem'l Hosp.*

*Authority*, 671 F.2d 372, 375 (10th Cir. 1982) (reversing the district court's decision to deny

motion for new trial based on prejudicial remarks during closing argument). "Fairness to the

parties and our system of justice dictates that 'there must be limits to pleas of pure passion and

there must be restraints against blatant appeals to bias and prejudice.'" *Whittenburg*, 561 F.3d at

1128 (quoting *Draper v. Airco, Inc.,* 580 F.2d 91, 95 (3rd Cir. 1978)). To this end, the Tenth

Circuit has suggested there are certain "basic rules of final argument." *Gregory*, 54 F.4th at

1211. "Counsel may not misstate the evidence or the law, argue facts that are not in evidence,

state their personal belief in the justice of their cause, personally vouch for the credibility of any

witness, appeal to passion or prejudice, or urge an irrelevant use of evidence." *Id.* (cleaned up)

(quoting James W. McElhaney, *Trial Notebook* at 669 (4th ed. 2005)); *see also Whittenburg*, 561

F.3d at 1128–29 (saying "the cardinal rule of closing argument" is "that counsel must confine

comments to evidence in the record and to reasonable inferences from that evidence"); Model

Rules of Prof'l Conduct R. 3.4 ("A lawyer shall not ... in trial, allude to any matter that the

lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence."); Jacob Stein, *Closing Arguments*, § 1:14 (2d ed. 2005) ("[C]ounsel is restricted to the law in the case, the evidence adduced from the witnesses, the exhibits admitted into evidence, and the inferences reasonably deductible from the testimony and exhibits."). Ultimately, "'[t]he trial judge is in the best position to determine' the prejudicial effect of improper arguments, and thus whether a new trial is warranted." *Whittenburg*, 561 F.3d at 1127 (quoting *Ketchum v. Nall*, 425 F.2d 242, 244 (10th Cir. 1970)).

The Court was surprised by Mr. Buzbee's approach several times during trial, and particularly during closing argument. As noted by Defendant, in closing, Mr. Buzbee:

- Inappropriately, and without evidentiary basis, commented on the potential damage award: "if [the jury awards] Plaintiff [$]9 million, Mr. Bibb and his crew will be high fiving in the parking lot. They will go home and they got a big win under their belts." (Doc. No. 308 at 1600:14–17.)

- Engaged in irrelevant and prejudicial discussion of Defendant's litigation costs: "23 million is what Ford spen[t] in five years to defend themselves. 53 is what they spent in ten years." (*Id.* at 1608:15–16.) Mr. Buzbee then inappropriately anchored his punitive damages argument at $53 million: "When you are trying to figure out what is a good punitive damages number, well, if it's 53 million over a ten-year period, that's 5.3 million a year, you say, this woman suffered seven years, so seven times 5.3 million, that's a legitimate way to do it. Maybe you say, you know what, we're going to make it more expensive for Ford to litigate than to fix it, 53 million."[32] (*Id.* at 1680:23–1609:4.)

---

[32] Mr. Buzbee also showed the jury slides to this effect, including a picture of the jury verdict form in which the punitive damages section was filed in with an award of "$23,000,000 – $53,000,000," as well as a picture of a bell curve titled "punitive damages" that, without explanation, showed the low end of the range to be "$10 million," the high end to be "$100 million," and the middle to be "$23,000,000 – $53,000,000." (Doc. No. 348-1 at 144, 149.) The jury was later shown a different bell curve slide that showed the low end of the range to be "$1 million," the high end to be "$50 million," and the middle to be "$18,000,000." (*Id.* at 239.)

- Implicitly impugned Defendant's right to defend itself and made an irrelevant reference to Defendant's size[33]: "you spend millions and millions of dollars defending yourself in cases instead of fixing the problem, this is where juries come in and do the important work." (*Id.* at 1609:3–5.)

- Engaged in ad hominem attacks on Defendant's counsel: "it's like Whac-A-Mole with these people," and "[Defendant's counsel] talk out of both sides of their mouths. They implicitly and in a roundabout—they won't even confront her to her face and say, you are poor, you got what you deserved. No. They just wiggle around the bush, beat around the bush and do that to her, like she's some kind of criminal." (*Id.* at 1588:4–8, 23.)

- Affirmatively declared something not in evidence when discussing out of park alarms: "we know now that Ford recalled vehicles and put this out-of-park alarm in them." (*Id.* at 1607:15–16.)

- Violated a pre-trial order to refrain from discussing other "cases" involving Defendant: "We know there are other cases going on in our country right now."[34] (*Id.* at 1579:18–19.)

- Implicitly suggested the jury should ignore the Court's instruction regarding negligence per se and Plaintiff's potential violation of Colorado law at the time of the subject incident: "And the judge just instructed you. Now, now for the first time, we heard, I think, on the last day of trial, that, you know what, it's Colorado law. She's in violation—not only is she poor and she's not very smart and she obviously doesn't work very hard, because why in the devil doesn't she have a job, even though her leg is going to be cut off, but now she's a lawbreaker. Now she's a lawbreaker. Even though they know the statute that they rely on says you can't leave your vehicle unattended. It doesn't say you

---

[33] Mr. Buzbee also showed the jury slides to emphasize this point, including one reading "second largest automaker...$176 billion in annual revenue" and another saying Defendant has "3,000 dealerships in the US." (Doc. No. 348-1 at 157, 159.) The Court also notes Mr. Buzbee made a similar remarks about Defendant's size in his opening statement. (*See* Doc. No. 302 at 22:12–13, 17–21 ("They're a large corporation....I think they're the second largest automaker, $176 billion in revenue. We all know that there's dealers allover our country. They're big business. They have millions of vehicles on the road....They're everywhere.").) The Court admonished Mr. Buzbee for this statement. (*Id.* at 153:15–17 ("[L]et me just make clear that you cannot mention their net worth or their relative size in connection with what they should be paying in a case like this.").)

[34] Mr. Buzbee made a similar comment during his opening statement, which the Court admonished him for. (*See* Doc. No. 302 at 37:3–4 ("I've heard some witnesses in Ford cases say 500,000 miles without this kind of thing happening."); *id.* at 155:4–5 ("[D]o not reference [other cases] off the cuff or insinuate it because that could be problematic.").)

can't get out of your vehicle when it's not in park and leave it running. It says you can't leave it unattended."[35] (*Id.* at 1588: 8–19.)

Based on these inappropriate and prejudicial assertions and arguments, the Court was forced to take the unusual step of issuing a substantial limiting instruction following Plaintiff's closing.[36] The Court hoped the limiting instruction would cure the prejudice caused by Plaintiff's

---

[35] While the transcript—limited by the constraints of written, as opposed to spoken, language—does not reflect a clear and express challenge to the Court's instruction, the Court distinctly recalls Mr. Buzbee's comments, tone, and approach, and considered them—both in the moment and now—to be an indirect challenge to the Court's instructions. (*See* Doc. No. 308 at 1588:8–19, 1618:13–15 ("[T]he way you said it, it certainly sounded like you were suggesting that somehow my instructions were improper on that.")); *see also Whittenberg*, 561 F.3d at 1128 (saying the trial judge "is uniquely positioned to assess the prejudicial effect of an improper argument in the context of the overall trial").

[36] The Court issued the following limiting instruction subsequent to Plaintiff's closing argument:

First, Plaintiff's counsel made general references toother cases and litigation during closing. I want to remind you that just because someone files a case or makes an allegation, it does not mean that the allegation is true or that the plaintiff in another case will prevail. We also don't know whether any other case involves this product. In any event, general references to other cases or litigation should not bear on your decision in this case, which has to be based on the evidence in this case and not any other case.

Second, Plaintiff's counsel accused Defendant of spending a significant amount of money on this case and others. You should not take that into account when determining fault, negligence, liability or damages, because a defendant is entitled to defend itself in litigation.

Number three, Plaintiff's counsel made a reference to Dr. Harley's testimony, suggesting that she testified that the company she worked for paid Ford over $100 million, but she testified she didn't know, and so you will disregard counsel's characterization of Dr. Harley's testimony in that respect.

You'll also disregard the statement that counsel made that Ford recalled vehicles and put the out-of-park alarm in them. That was not evidence in this case.

closing. But upon reflection, the Court concludes this instruction was simply not enough. *See*

*Cadorna v. City & Cnty. of Denver, Colorado*, 245 F.R.D. 490, 495 (D. Colo. 2007) ("Although

I issued curative instructions on numerous occasions, I have no confidence that my admonitions

were sufficient to ameliorate the prejudicial impact of such a thoroughgoing and pertinacious

campaign. 'The bench and bar are both aware that cautionary instructions are effective only up to

a certain point. After repeated exposure of a jury to prejudicial information cautionary

instructions will have little, if any, effect in eliminating the prejudicial harm.'" (cleaned up)

(quoting *O'Rear v. Fruehauf Co*rp., 554 F.2d 1304, 1309 (5th Cir. 1977))).

   The *Whittenburg* case is instructive. *Whittenburg* was a negligence case against a

trucking company by a driver who was seriously injured after he hit one of the defendant's

stalled trucks on a dark road. 561 F.3d at 1124. During closing argument, the plaintiff's counsel

"asked the jury to 'imagine' with him that, shortly after [the plaintiff] had left the house the night

of the accident, [the defendant] delivered a letter to [the plaintiff's] children." *Id.*

> [T]he fictitious letter in effect confessed that various actions by the defendant's
> employees caused the accident and that they failed to properly respond. *See*
> *Whittenburg*, 561 F.3d at 1125–26 ("Once stuck on the highway, our drivers will
> ignore the law, and they will ignore our company procedures, and recklessly set a
> trap for your dad."). And it described in detail the physical pain the plaintiff was
> in during and after the accident. *See id.* at 1126 ("[H]e has to endure the
> claustrophobic remains of what's left of his pickup for nearly two hours while
> rescue workers work to free him.").

---

   And finally, counsel referenced my instructions in closing. Remember that my
instructions have to be followed. It's an important part of ensuring that your
decision in this case is based on applicable law.

(Doc. No. 308 at 1630:5–1631:5.)

*Gregory*, 54 F.4th at 1214–15 (cleaned up). The *Whittenburg* court remanded the case for a new

trial finding the "letter included a great many facts ... that lacked any basis in the evidence

adduced at trial," were "plainly calculated to arouse [the jury's] sympathy" and "suggest[ed] that

the defendant acted with a degree of calculated intentional malevolence." 561 F.3d at 1128–29.

Further, the court noted much of the letter was devoted to "vituperative attacks on defendants

and their counsel," which "had no basis in evidence adduced at trial." *Id.* at 1129; *see, e.g.*, *id.* at

1126–27 ("We will do everything in our power to convince the jury that your dad was really not

all that injured in the first place, and that your dad is overreaching in trying to prove his

damages. Of course, if none of that works, our lawyers will accuse your dad of being a failure

because his law firm used to have 20 members and now it only has five." (brackets omitted)).

The Court also found the letter's suggestion the defendant "spent vast sums of money" and was

"'using smoke and mirrors and half truths' in order 'to try and shift the jury's focus away from

the real issue in this case,'" was "especially concerning," "reprehensible," and improperly

encroached on the right of "[e]very individual and entity...to mount a non-frivolous defense

against allegations of negligence or other misconduct." *Id.* at 1129–30; *see id.* ("To imply or

argue that the mere act of defending oneself, or the mere act of bringing suit, is reprehensible

serves no proper purpose, and for time out of mind it has been the basis for appellate courts

ordering new trials.").

Though Mr. Buzbee did not utilize a rhetorical device like the *Whittenburg* letter, his

approach to closing was similar in several ways. *See generally id.* at 1128 (noting the court based

its decision not on "using an imaginary letter as a way to structure a closing argument" but on the

"content" of the closing argument). First, Mr. Buzbee leveled inappropriate and baseless attacks

against opposing counsel, commented on things not in evidence, discussed Defendant's size and

litigation costs, impugned Defendant's right to a defense, and violated pre-trial orders.[37] Second,

and going beyond the conduct in *Whittenburg*, Mr. Buzbee took the provocative step of implying

that one of the Court's instructions to the jury was somehow flawed, could be ignored, or was

otherwise part of Defendant's allegedly improper conduct. *See Gregory*, 54 F.4th at 1211 (noting

counsel may not "may not misstate...the law" during a closing argument); *see also Burke v.

Regalado*, 935 F.3d 960, 1030 (10th Cir. 2019) (noting that "some attorney commentary

on jury instructions may be proper" but "assum[ing] without deciding" that counsel saying,

"[d]on't get overwhelmed with the jury instructions....It doesn't take a lot to know that [the

plaintiff's] civil rights were violated in this case" was improper).

    And though Mr. Buzbee's improper comments were a smaller portion of his closing

remarks than those in the *Whittenburg* closing,[38] they were far from a "a stray improper remark"

or otherwise "minor aberrations." *Whittenburg*, 561 F. 3d at 1131; *see also King*, 485 F.3d at 591

---

[37] The Court observes that Mr. Buzbee's apparent misunderstanding of certain pre-trial orders
and lack of clarity as to the evidence in this case may be the result of his minimal involvement in
the case prior to trial. Mr. Buzbee entered an appearance on October 23, 2023, (Doc. No. 185)—
more than three years after the case began, a year and a half after its transfer to this District, and
after the closing of discovery and filing of most pre-trial motions. Furthermore, he did not attend
any pre-trial conferences or appear to draft any pre-trial briefs. Such limited engagement
inevitably increases the likelihood that counsel may lack a full grasp of the facts and legal issues
involved in a case—particularly a relatively technical one, such as this. While there is no rule
against having new counsel joining for trial purposes only, parties who do so assume the
associated risks.

[38] *See Whittenburg*, 561 F. 3d at 1129 (noting the imaginary letter was "over half of counsel's
closing argument" and that the attacks on the defendant and its counsel were "approximately a
quarter of [the plaintiff's] closing argument").

52

Case No. 1:22-cv-00541-MDB    Document 368    filed 02/03/25    USDC Colorado    pg
53 of 55

(10th Cir. 2007) ("[W]here counsel truly overemphasizes an improper argument...we find the requisite prejudice and order a new trial.").

The Court acknowledges, as Plaintiff emphasizes, that unlike in *Whittenburg*, the Court issued a limiting instruction right after Plaintiff's closing argument. In *Whittenburg*, the Tenth Circuit noted "curative instructions—issued promptly after the improper argument and specifically addressing the precise impropriety complained of—can go far in erasing prejudice occasioned by an improper remark." 561 F. 3d at 1131. But a post-closing instruction does not necessarily obviate the need for a new trial, it is merely one consideration in the Court's overall review of the issues. Here, and as noted above, the Court has concluded its instruction was, simply put, insufficient. The tenor of, and emphasis placed on, the offending remarks, coupled with the nature of Mr. Buzbee's closing—which was not fully grounded in the evidence, and appeared aimed at inflaming juror emotions[39]—made it difficult to cure the prejudice with a limiting instruction. All counsel have great latitude in their approach to trial presentation, but a federal courtroom is not a theatre. And jurors are not an audience to entertain and impassion— they are fact finders charged with uncovering the truth and delivering justice.

Further, the Court rejects Plaintiff's argument that Defendant waived some or all of its objections to Plaintiff's closing argument by failing to object to every complained-of statement or by acquiescing to the Court's proposed limiting instruction. Indeed, the trial transcript shows

---

[39] Indeed, the oversized nature of the award confirms the remarks played to the jury's passions rather than their reason. *See Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1121 (10th Cir. 2004) (noting that an excessive punitive damage award may "raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial." (quoting *Telecor Communications, Inc. v. Southwestern Bell*, 305 F.3d 1124, 1143 (10th Cir. 2002)).

53

Defendant made multiple objections during Plaintiff's closing. (*See* Doc. No. 308 at 1585:5–19

(objecting to argument regarding Defendant's litigation costs); *id.* at 1608:17–20 (objecting to

argument anchoring Plaintiff's punitive damages at $53 million).) It further shows the Court's

limiting instruction did not incorporate every single request made by Defendant. (*See id.* at

1622:7–1626–12.) In any event, to the extent Defendant failed to object to some of the

statements, the Tenth Circuit has recognized "the district court can exercise its discretion to

review allegations of [attorney] misconduct without a timely objection when the 'interest[s] of

judicial fairness' so require." *Moody v. Ford Motor Co.*, 506 F. Supp. 2d 823, 831 (N.D. Okla.

2007) (quoting *Ryder v. City of Topeka,* 814 F.2d 1412, 1424 (10th Cir. 1987)). This discretion is

particularly important here because the pervasive misconduct placed Defendant in the "untenable

position of making constant objections and antagonizing the jury." *Id*. (citing *Anheuser–Busch,

Inc. v. Natural Beverage Distributors,* 69 F.3d 337, 346 (9th Cir. 1995)); *see also Cadorna*, 245

F.R.D. at 495 ("Nor is it any answer to the overwhelming effect of such prejudicial conduct to

argue...that defendant waived its right to complain by failing to object at every instance where

objection was warranted....Counsel's duty to conform his behavior to the fair boundaries of

zealous advocacy does not turn on whether his opponent objects....At some point, continuing to

object itself becomes a source of potential prejudice to the opposing party."); *Hormel v.

Helvering,* 312 U.S. 552, 557 (1941) ("Rules of practice and procedure are devised to promote

the ends of justice, not to defeat them....Orderly rules of procedure do not require sacrifice of the

rules of fundamental justice.").

In short, counsel's conduct was prejudicial and forms the final basis for this Court's

decision that Defendant is entitled to a new trial.[40]

## CONCLUSION

For the foregoing reasons it is

**ORDERED** that Defendant Ford's Renewed Motion for Judgment as a Matter of Law

Pursuant to F.R.C.P. 50(b) (Doc. No. 313) is **DENIED**. It is further

**ORDERED** that Defendant Ford's Motion for a New Trial Pursuant to F.R.C.P. 59 (Doc.

No. 314.) is **GRANTED**. It is further

**ORDERED** that Ford's Motion to Alter or Amend the Judgment Under F.R.C.P. 59(e)

(Doc. No. 315) and Plaintiff's Motion to Amend Judgment Pursuant to FED.R.CIV.P. 59(e) (Doc.

No. 316) are **DENIED as moot.**

A video Status Conference is **set for March 3, 2025 at 10:00 AM**. The parties are

directed to the video instructions previously provided. (*See, e.g.*, Doc. No. 352.)

Dated this 3rd day of February, 2025.

**BY THE COURT:**

Maritza Dominguez Braswell
United States Magistrate Judge

---

[40] Defendant references other potential misconduct by Mr. Buzbee, including using the NHTSA
C8-02 report as substantive evidence rather than for notice (Doc. No. 314 at 36), violating the
parties' stipulation as to the feasibility of out-of-park alarms (*id.*), and making vague references
to an alleged incident where a vehicle self-shifted into Reverse after 30 minutes (*id.*). The Court
is inclined to agree, but finds the arguments underdeveloped and unnecessary to its conclusion.