IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Maritza Dominguez Braswell**

Civil Action No. 22–cv–00541–MDB

LORELLE THOMPSON,

     Plaintiff,

v.

FORD MOTOR COMPANY, a Delaware company,

     Defendant.

---

## ORDER

---

This matter is before the Court on Ford Motor Company's Motion to Exclude Richard

Hille Pursuant to Federal Rule of Evidence 702 and Renewed Motion for Summary Judgment.

(["Motion"], Doc. No. 396.) Plaintiff has responded in opposition (Doc. No. 398) and Defendant

has replied in support. (Doc. No. 403.) Additionally, the Court conducted a *Daubert* Hearing (the

"Hearing") on July 22, 2025, during which it heard the testimony of Plaintiff's expert, Richard

Hille. (Doc. Nos. 391; 392; 395.) After reviewing the Motion, briefing, relevant transcripts, and

applicable law, it is **ORDERED** that Defendant's Motion is **GRANTED**.

### BACKGROUND

This is a products liability action concerning a 1998 Ford Expedition owned by Plaintiff,

Lorelle Thompson. On December 27, 2016, Plaintiff was driving the vehicle in her neighborhood

and stopped near her mailbox to check her mail. Upon exiting the vehicle, Plaintiff fell to the

ground. While Plaintiff was on the ground, the vehicle rolled backward over her left leg.

At a high-level, it is Plaintiff's contention that when she exited the vehicle, she slipped on ice, fell to the ground and lay there for a few seconds before the vehicle began rolling rearward and over her leg (the "false park" theory). She attributes the rearward movement to worn bushings that became loose and eventually dislodged, allowing her to shift into "false park" when she believed the vehicle was in park. Then, and with the vibrations of the running engine, the vehicle self-shifted into reverse, at which point it rolled over her. Defendant on the other hand, contends Plaintiff must have attempted to shift into park but mistakenly shifted into reverse instead. As she was existing the vehicle to grab her mail, she took her foot off the brake and the vehicle immediately began to roll back, knocking her down and running her over (the "drive to reverse" theory).

The Court held an eight-day jury trial from April 8 to April 17, 2024. (*See* Doc. Nos. 302–09.) At the end of trial, the jury returned a unanimous verdict in favor of Plaintiff and against Defendant, awarding Plaintiff $11,575,000 in compensatory damages and $45,000,000 in punitive damages.[1] (*See* Doc. No. 298.)

Subsequent to trial, the Court granted Defendant's Federal Rule of Civil Procedure 59(a)(1)(A) motion, finding Defendant was entitled to a new trial on multiple grounds. (Doc. No. 368.) As is relevant to the instant Motion, the Court determined that Plaintiff's expert, Neil Hanneman, improperly served as a mouthpiece for Richard Hille, another of Plaintiff's experts and co-author of the Hille/Hanneman expert report. (*Id.* at 20–24.) Though Plaintiff represented Mr. Hille would testify at trial, and though Mr. Hille's anticipated trial testimony was central to

---

[1] The award was for Plaintiff's Strict Liability and Negligence claims. The Court dismissed all other claims asserted by Plaintiff during the course of this action. (*See* Doc. No. 228 at 28–35; Doc. No. 282; Doc. No. 306 at 1060:20–1069:23.)

surviving the 702 challenge on the exemplar testing (*see* Doc. No. 228 at 24–25), Mr. Hille was never called at trial. (*Id.* at n. 4.) The Court found that Plaintiff improperly shielded Mr. Hille from cross examination by having Mr. Hanneman testify as to the results of Mr. Hille's testing on the exemplar vehicle. (*Id.*)

The Court further noted it was "clear" that "Mr. Hille will need to testify [at any new trial] in order for Plaintiff to satisfy her causation burden." (*Id.* at n. 11.) However, the Court also determined that Plaintiff's trial strategy had "raised meaningful doubts" as to whether Mr. Hille could satisfy the reliability threshold under Rule 702. (*Id.*) Accordingly, the Court ordered the Hearing, during which Mr. Hille testified about his qualifications, methodology, principles, and opinions in this matter. (Doc. No. 391.)

Following the Hearing, Defendant filed the instant Motion, arguing that pursuant to Rule 702, Mr. Hille should be excluded from any new trial. (Doc. No. 396 at 6–17.) Defendant argues Mr. Hille's opinions are unreliable and *ipse dixit*. (*Id.*) Defendant also argues that if the Court excludes Mr. Hille's testimony, Plaintiff cannot carry her causation burden at trial, requiring summary judgment in Defendant's favor. (*Id.* at 17–24.)

## LEGAL STANDARD

### I.    Federal Rule of Evidence 702

The standard for admitting expert testimony is set forth in Rule 702 as interpreted by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceutical, Inc.*, 509 U.S. 579 (1993). As amended in December 2023, Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

3

understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Under *Daubert*, district courts "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. In this sense, a court acts as a "gatekeeper" in admitting or excluding expert testimony. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2005); *Pinon Sun Condo. Ass'n, Inc. v. Atain Specialty Ins. Co.*, 2020 WL 1452166, at *3 (D. Colo. Mar. 25, 2020). Fulfilling this gatekeeping function requires a two-part analysis. First, the Court must consider whether the expert testimony is relevant. Expert testimony is relevant if it would assist "the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Second, the Court must consider whether the expert opinions are scientifically sound and reliable. *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999).

In conducting the reliability inquiry, courts may consider: (1) whether a theory has been or can be tested or falsified, (2) whether the theory or technique has been subject to peer review and publication, (3) whether there are known or potential rates of error with regard to specific techniques, and (4) whether the theory or approach has "general acceptance." *Bitler*, 400 F.3d at 1233 (citing *Daubert*, 509 U.S. at 593–94). However, "this list is neither definitive nor exhaustive," and courts have "wide discretion both in deciding how to assess an expert's reliability and in making a determination of that reliability." *Id*. (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 at 150, 152–53 (1999)). Generally, courts should focus not on "the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions." *Id*. (citing *Daubert*, 509 U.S. at 595). "Although it is not always a straightforward

exercise to disaggregate method and conclusion, when the conclusion simply does not follow from the data, a district court is free to determine that an impermissible analytical gap exists between premises and conclusion." *Id*. (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Dodge v. Cotter Corp*., 328 F.3d 1212, 1222 (2003)). "Thus it is the specific relation between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute, and not asymptotic perfection, that renders testimony both reliable and relevant." *Id*. at 1234

The burden to show the expert's testimony is relevant and reliable (and therefore admissible), is on the proponent of the testimony. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

## II.    Summary Judgment

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but instead, must designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c).

"A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v.*

*Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury," or conversely, whether the evidence "is so one-sided that one party must prevail as a matter of law." *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (1987) (quoting *Anderson*, 477 U.S. at 251–52). A disputed fact is "material" if "under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal−Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248). "Where the record taken as a whole could not lead a rational trier of fact to find for the [nonmovant], there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## ANALYSIS

### I.      Rule 702

In their joint expert report, Mr. Hille and Mr. Hanneman concluded that during the incident in question Plaintiff shifted her vehicle into false park and was run over after the shift lever moved into powered reverse. (Doc. No. 399 at 20–22.) This conclusion, and the expert report as a whole, places significant reliance on the exemplar testing conducted by Mr. Hille. Defendant challenges the reliability of Mr. Hille's testing, methods, and related testimony. (*See* Doc. No. 396 at 6–17.)

"When considering reliability, 'the purpose of the ... inquiry is always 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Crew Tile Distribution, Inc. v. Porcelanosa Los Angeles, Inc.*, 763 F. App'x 787, 796 (10th Cir. 2019) (quoting *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222–23 (10th Cir. 2003)). "The plaintiff need not prove that the expert is undisputably correct .... [However,] the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on [reliable] facts." *Mitchell*, 165 F.3d at 781. At a minimum, a party proffering an expert must do more than ask the Court to "simply tak[e] the expert's word for it." *White v. Gen. Motors LLC*, 2024 WL 4100855, at *2 (D. Colo. Feb. 29, 2024) (quoting Fed. R. Evid. 702 (advisory committee note)). "[A]ny step that renders the analysis unreliable renders the expert's testimony inadmissible." *Crew Tile Distribution, Inc.*, 763 F. App'x at 796 (quoting *Dodge*, 328 F.3d at 1222) (internal quotation omitted).

Mr. Hille conducted testing on an exemplar Ford Expedition on February 17, 2023.[2] (Doc. No. 154-6 at 18.) This testing was not well documented or controlled. Mr. Hille took just eight photographs[3] and no videos during his testing. (*Id.* at 53:6–12; 75:2–24.) Thus, the Court was not able to review any footage of the testing. Moreover, Mr. Hille apparently did not create

---

[2] Mr. Hille also spent time with the exemplar vehicle in January 2023. However, at the time, the exemplar had a malfunctioning bushing that led to the shift cable repeatedly coming detached, preventing Mr. Hille from conducting meaningful testing. (Doc. No. 392 at 44:7–10.)

[3] Defendant describes these photographs as "inconsequential" because they fail to demonstrate anything about Mr. Hille's testing methodology or results. (Doc. No. 396 at 5.) The Court agrees with this characterization and Plaintiff does not appear to dispute it. (*See generally* Doc. No. 388.)

any contemporaneous written record of his testing conditions or results. (*See* Doc. No. 404 at ¶ 20; *see also* Doc. No. 392 at 69:23–70:5 (in which Mr. Hille did not dispute the Court's statement that there were "no notes" made during the testing); Doc. No. 392 at 75:24 (testifying that "I trust people will believe me" when explaining the lack of documentation for the exemplar testing).)

Additionally, Mr. Hille's testimony revealed that the testing was inexact in several ways. First, he testified that he moved the exemplar vehicle's shifter from drive to park "*approximately* 100" times, that "*about* half the time" the shift lever failed to reach the park detent and instead ended up in false park, and that on "two occasions" the shift lever fell from false park into powered reverse. (Doc. No. 392 at 23:21–25:12 (emphasis added).) Second, Mr. Hille broadly testified "it [took] seconds" for the shift lever to fall from false park to reverse on those two occasions, but he did not offer an exact time. (*Id.* at 57:17–19.) Third, Mr. Hille testified that he did not measure the force with which he moved the shifter from drive to park, and that he deliberately perched the shifter into false park "[a] couple of times." (Doc. No. 392 at 73:22–74:20.) Fourth, although the testing conditions varied throughout the day, there is no indication that these variations were documented or accounted for. Specifically, the exemplar vehicle's shift cable was initially secured to the shift lever with "gorilla tape" due to a malfunctioning bushing and was later reattached using a newly purchased bushing. (*Id.* at 22:8–20.) Mr. Hille testified that "75, 80 percent" of the testing was done with the new bushing, and the rest was done with the tape, but he did not specify how many tests were conducted with tape as opposed to the new bushing. (Doc. No. 392 at 22:32–23:1.) Moreover, Mr. Hille did not identify which

configuration—the tape or the new bushing—was in use when the shifter moved from false park to powered reverse.

As the Court noted during the *Daubert* hearing, Mr. Hille's lack of documentation essentially requires the Court to "just believe him" in order to admit his opinions. (*Id.* at 113:12.) While an expert need not adhere to any one documentation protocol, the near-total absence of records here, makes meaningful review of Mr. Hille's methodology impossible. And though the Court was initially of the view that the gaps it saw on paper could be addressed through cross-examination, (*see* Doc. No. 228 at 20–27), the Hearing revealed that is not the case. Mr. Hille's testimony during the Hearing made it clear that the purported results of the exemplar testing rest on little more than his own say-so, which is an insufficient basis on which to admit expert testimony under Rule 702. *See* Fed. R. Evid. 702 (advisory committee note) ("The trial court's gatekeeping function requires more than simply taking the expert's word for it." (internal quotation marks omitted)). "Plaintiff bears the burden of showing that his expert's opinions and testimony are 'based on sufficient facts and data.'" *White*, 2024 WL 4100855, at *6 (quoting Fed. R. Civ. P. 702). Plaintiff has not carried her burden here, and Mr. Hille will not be permitted to testify about his exemplar testing at any new trial.

## II.    Summary Judgment

With Mr. Hille's testimony excluded, the Court must consider Defendant's renewed request for summary judgment, on causation grounds. The question to be resolved is straightforward: is Plaintiff's causation evidence sufficient to reach the jury on her false park theory?

Defendant contends it is not, arguing that proving causation here requires expert testimony, and Plaintiff's other experts, Mr. Vosburgh and Mr. Hanneman, cannot provide sufficient causation evidence to satisfy Plaintiff's burden. (Doc. No. 396 at 17–24.) Plaintiff argues that the jury can infer causation from circumstantial evidence, or, alternatively, that Mr. Vosburgh and Mr. Hanneman provide sufficient causation evidence. (Doc. No. 398 at 12–24.)

"In Colorado, a plaintiff must establish causation beyond 'mere possibility or speculation.'" *Nash v. Wal-Mart Stores, Inc.*, 2017 WL 5188339, at \*9 (D. Colo. Feb. 15, 2017) (quoting *Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1214 (10th Cir. 2004)), *aff'd*, 709 F. App'x 509 (10th Cir. 2017). And "when proof of causation requires answering technical questions which are beyond the discernment capacity of laypersons[,]" "expert testimony is generally required." *White v. Gen. Motors LLC*, 2024 WL 4213764, at \*3 (D. Colo. Sept. 17, 2024) (quoting *Mathison v. United States*, 619 F. App'x 691, 694 (10th Cir. 2015)) (collecting cases); *see Park Rise Homeowners Ass'n, Inc. v. Res. Const. Co.*, 155 P.3d 427, 430 (Colo. App. 2006) (observing that expert testimony may be needed "where the issue does not lie within the ambit of common knowledge of ordinary persons").

It is true that in some instances, "causation may also be inferred by a jury if the Plaintiff has provided evidence that would make the inference reasonable." *Nash*, 2017 WL 5188339, at \*9 (citing *Truck Ins. Exch.*, 360 F.3d at 1214). But here, causation is not plainly identifiable by an average layperson. Indeed, to establish the vehicle was in false park and then shifted into reverse at the time of the accident, Plaintiff must answer complex technical questions that fall well outside lay competence. A juror who learns that a vehicle rolled backward after the driver exited has no basis, without expert guidance, to conclude whether that movement resulted from a

mechanical defect or an inadvertent gear shift. Resolving that question requires specialized knowledge of transmission mechanics and accident reconstruction that falls outside common experience. Without expert testimony connecting the alleged defect to the vehicle's movement, any causation finding would rest on speculation rather than evidence.

Thus, the question becomes whether Plaintiff's remaining experts—Mr. Hanneman and Mr. Vosburgh—can provide sufficient evidence, such that, in combination with the other evidence in this case, a jury may reasonably infer that Plaintiff's injuries were caused by a defect, pursuant to her false park theory.

As a threshold matter, neither Mr. Vosburgh nor Mr. Hanneman conducted testing to demonstrate precisely how Plaintiff's vehicle shifted from false park into reverse. Mr. Vosburgh is an accident reconstructionist who specifically testified in his deposition that he was "not opining on the design defects or the design or ... failure analysis or failure modes of this ... mechanism." (Doc. No. 396-4 at 23:1.5–21.) Moreover, Mr. Hanneman "focused on the design of the shift system" and identified alternative designs for the shift system. (Doc. No. 162 at 37–38.) But he did not undertake any direct testing on causation, which was left for Mr. Hille. (*See id.* at 37 (saying Mr. Hanneman's work "addresses different aspects of the analysis from Mr. Hille").)

Still, Plaintiff argues Mr. Hanneman and Mr. Vosburgh can present enough evidence to support her theory of causation under "a process of reasoning to the best inference" theory. (Doc. No. 398 at 15–18); *see Bitler*, 400 F.3d at 1237; *Roe v. FCA US LLC*. 42 F.4th 1175, 1182–83 (10th Cir. 2022). Inference theory "requires a process of eliminating possible causes as improbable until the most likely one is identified." *Bitler*, 400 F.3d at 1237. Thus, "an inference

to the best explanation for the cause of an accident must eliminate other possible sources as highly improbable, and must demonstrate that the cause identified is highly probable." *Id.* at 1238. To this end, Plaintiff must do more than show her theory is a "mere possibility." *Id.*

According to Plaintiff, her false park theory satisfies this standard because Mr. Vosburgh and Mr. Hanneman have "eliminated" Defendant's theory that Plaintiff shifted from drive to reverse during the incident in question.[4] Plaintiff points to Mr. Hanneman's use of a "differential analysis 'to rule out unlikely scenarios prior to developing a theory,'" and his opinion that the incident would not have occurred absent a design defect. (Doc. No. 398 at 17–18 (citing Doc. No. 399-17 at 4).) She also says Mr. Vosburgh found "Ms. Thompson did not shift into reverse when she stopped by her mailbox, ruling out that scenario." (*Id.* at 18; *see id.* at 3 (describing Mr. Vosburgh's testing and opinion).)

Plaintiff misses the mark. Having her experts leap to the conclusion that her theory is correct and Defendant's is wrong, does not satisfy the best inference standard. It is true that Mr. Vosburgh's reconstruction showed the vehicle moving backward "almost immediately" when placed in reverse, (Doc. No. 398 at 3), allowing him to "conclude[ ] the vehicle must have been in false park when Ms. Thompson got out of it, because it did not move for 5-6 seconds after she got out of the vehicle." (*Id.*) But the 5-to-6-second timeframe, the linchpin of this conclusion, is derived almost entirely from Plaintiff's self-serving statements and hearsay statements made by L.T., a nine-year old child who was inside the vehicle during the incident. (*Id.* (citing Plaintiff's

---

[4] Plaintiff also argues that certain testimony by Defendant's experts supports her best inference theory, including Hugh Malden's testimony that Plaintiff's vehicle could be placed in "hydraulic neutral" resulting in unintended vehicle movement. (*See* Doc. No. 398 at 18.) But testimony that something is *possible*, does not make something *probable*, nor does it make something else highly *improbable*.

Additional Disputed Facts ("PADF") ¶¶ 76–77); *see* PADF ¶¶ 76–77 (noting Mr. Vosburgh testified his opinion was consistent with L.T.'s statements) (citing Doc. No. 302 at 99:23–100:11, 109:6–110:7).) Those factual statements may be enough to make the false park theory *possible*, but it does not offer the type of expert evidence that makes the theory "highly probable." *See Bitler*, 400 F.3d at 1238.

Mr. Hanneman's opinion, which also relied heavily on the 5–6 second period described by L.T., fares no better. (Doc. No. 398 at 4 (saying "Mr. Hannemann relied upon the facts of the incident, which established that the vehicle did not move for 5-6 seconds after Ms. Thompson took her foot off of the brake").) And, to the extent Mr. Hanneman's opinions are at least in part predicated on Mr. Hille's exemplar testing, they have lost a key pillar of support.

Moreover, though the Hille/Hanneman expert report says the experts conducted a "differential diagnosis" analysis to "rule out unlikely scenarios" (Doc. No. 399-17 at 4 (internal quotation marks omitted)), Plaintiff does not describe what this analysis consisted of, nor does she explain how it meets the best inference standard. (*See* Doc. No. 399 at 17 (merely stating that the Hille/Hanneman expert report "used a method of differential analysis to rule out unlikely scenarios prior to developing a theory."(internal quotation marks omitted)).) In any event, the best inference standard requires more than "ruling out" different possibilities as "unlikely," it requires an expert to "eliminate other possible sources as highly improbable, and ... demonstrate that the cause identified is highly probable." *Bitler*, 400 F.3d at 1238.

In short, the best inference standard does not rescue Plaintiff's causation case. Without the exemplar testing and additional explanation flowing from the exemplar testing, there is an "analytical gap," similar to the one discussed in *Roe*. 42 F.4th at 1182 ("Without this testing or

additional explanation, it is totally unsupported why the experts believe the shifter could shift on its own into reverse after remaining in false park for sufficient time.").[5] Just as the *Roe* court rejected the best inference analysis because plaintiff's experts had "not demonstrated that their [false park] hypothesis was even possible—let alone highly probable," *id.* at 1183, the Court rejects it here.[6]

Plaintiff's causation case was weak from the outset. The Court nonetheless permitted Plaintiff to advance a patchwork of evidence and theories past Defendant's initial Rule 702 challenge. (Doc. No. 228 at 15–28.) Central to that ruling, however, was the Court's understanding that Mr. Hille would testify at trial, and through his exemplar testing, demonstrate that Plaintiff's theory was not merely possible, but probable. (*Id.* at 24–25.) But at the eleventh-hour Plaintiff withdrew Mr. Hille as a witness. Now, with the benefit of hearing directly from

---

[5] In considering Defendant's post-trial motion for judgment as a matter of law, the Court wrestled with, and ultimately rejected, Defendant's *Roe* argument. (*See* Doc. No. 368 at 13–15.) Specifically, the Court concluded that, though "the facts and issues in *Roe* are strikingly similar to those here," *Roe* involved essentially no causation evidence, whereas Plaintiff did, during trial, put forward at least some causation evidence—specifically, and as relevant here, Plaintiff offered Mr. Hanneman's testimony *about Mr. Hille's exemplar testing*. (*Id.* (emphasis added).) However, now that the Court has excluded Mr. Hille's exemplar testing testimony, the linchpin of Plaintiff's causation case is gone. That makes *Roe* almost directly on point, and, indeed, controlling.

[6] Plaintiff also invokes the malfunction doctrine, a *res ipsa loquitur*-style theory permitting proof of a defect through circumstantial evidence where the incident "(a) was of a kind that ordinarily occurs as a result of product defect; and (b) was not, in the particular case, solely the result of causes other than product defect existing at the time of sale or distribution." Restatement (Third) of Torts: Product Liability § 3 (1998); *see Olivero v. Trek Bicycle Corp.*, 291 F. Supp. 3d 1209, 1220 (D. Colo. 2017) (saying the malfunction doctrine "has been embodied in" section 3 of the Third Restatement of Torts); *Heikkila v. Kahr Firearms Grp.*, 2023 WL 2375082 (D. Colo. Mar. 6, 2023). That doctrine does not apply here. Plaintiff cannot satisfy the first element—that the accident was of a kind that ordinarily occurs as a result of a product defect. To the contrary, Defendant's drive-to-reverse theory offers a straightforward, non-defect explanation for how the accident may have occurred. Where an equally plausible, indeed simpler, alternative cause exists, the malfunction doctrine's foundational premise is not established.

Mr. Hille at the Hearing, the Court has no doubt that Defendant was right—Mr. Hille's trial testimony would offer nothing more than *ipse dixit*. Perhaps that is why Plaintiff made the last-minute call to take Mr. Hille off the witness list.

Without Mr. Hille's exemplar testing testimony, Plaintiff cannot offer the type of expert testimony necessary to support her causation case. Because the record taken as a whole cannot "lead a rational trier of fact to find for [Plaintiff], there is no 'genuine issue for trial,'" and Defendant is entitled to summary judgment as a matter of law. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

### CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Ford Motor Company's Motion to Exclude Richard Hille Pursuant to Federal Rule of Evidence 702 and Renewed Motion for Summary Judgment. (Doc. No. 396) is **GRANTED**. It is further

**ORDERED** that Ford's Motion for Oral Argument (Doc. No. 405) is **DENIED as moot**.

The Clerk of Court is directed to **close this case**.

Dated this 24th day of March, 2026.

**BY THE COURT:**

_____
Maritza Dominguez Braswell
United States Magistrate Judge